**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2346
_____

GERALDINE JOHNSON, as Admnistratrix of the Estate of
Kenyado D. Newsuan, Deceased Plaintiff,
                                        Appellant

v.


CITY OF PHILADELPHIA, POLICE OFFICER THOMAS
DEMPSEY, Badge # 1577


_____

On Appeal from the U.S. District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-14-cv-02331)
District Judge:  Honorable William H. Yohn
_____

Argued February 11, 2016

Before:  FUENTES, KRAUSE, and ROTH, *Circuit Judges*

(Opinion Filed: September 20, 2016)

Armando A. Pandola, Jr., Esq. **[ARGUED]**
Alan E. Denenberg, Esq.
Abramson & Denenberg, P.C.
1315 Walnut St., 12th Floor
Philadelphia, PA 19107
*Attorneys for Appellants*

Craig R. Gottlieb, Esq. **[ARGUED]**
City of Philadelphia Law Department
17th Floor
1515 Arch Street
One Parkway
Philadelphia, PA 19102
*Attorneys for Appellees*

———————————

OPINION OF THE COURT
———————————

FUENTES, *Circuit Judge*:

Kenyado Newsuan was standing in the street, naked, high on PCP, and yelling and flailing his arms. Philadelphia police officer Thomas Dempsey arrived on the scene and, without waiting for backup, ordered Newsuan to approach. What happened next is a matter of some dispute, but what happened at the end of the encounter is not: Newsuan attacked Dempsey, slammed him into multiple cars, and tried to remove Dempsey's handgun. At that point, Dempsey shot and killed Newsuan.

The administratrix of Newsuan's estate sued Dempsey and the City of Philadelphia under 42 U.S.C. § 1983 for using unconstitutionally excessive force. The District Court granted summary judgment to the defendants. On appeal, Plaintiff argues that the shooting was unreasonable under the Fourth Amendment because Dempsey unnecessarily initiated a one-on-one confrontation with Newsuan that led to the subsequent fatal altercation. Whatever the merits of that liability theory in the abstract, we conclude that Newsuan's violent attack on officer Dempsey was a superseding cause that severed any causal link between Dempsey's initial actions and his subsequent justified use of lethal force. We will therefore affirm.

## I. BACKGROUND

### A. Factual Background

In the early morning hours of April 22, 2012, Officer Thomas Dempsey of the City of Philadelphia Police Department was on solo patrol in a radio car in North Philadelphia. Dempsey was armed with a baton, a taser, and a nine-millimeter Glock handgun. Around 2:00 a.m., Dempsey received a radio call that a naked man was standing in the street in the 5800 block of North Mascher Street. Dempsey and two other patrol officers responded to the call, but found no one. Around 5:30 a.m., Dempsey responded to another call about a naked man on the same block, but again found no one.

3

At approximately 6:00 a.m., a passing motorist informed Dempsey that a naked man was in the street at the corner of North Mascher and Nedro Avenue. Dempsey radioed in the information and drove down North Mascher to the intersection. There, Dempsey saw a naked man, later identified as Kenyado Newsuan, standing in front of a residence at 5834 North Mascher.

Accounts diverge as to what happened next. The record contains testimony from four eyewitnesses: Officer Dempsey, Juan Cruz, Raimundo Rivera, and Newsuan's girlfriend, Christina La Torre.

### i. Testimony of Officer Dempsey

Dempsey testified that as he crossed Nedro Avenue into the 5800 block of North Mascher, he saw Newsuan standing in the middle of the street. Dempsey estimated Newsuan to be six feet tall and 220 pounds. As Dempsey pulled to a stop, Newsuan began walking out of the street toward a house (later determined to be La Torre's residence). Dempsey did not radio to dispatch that he had encountered the subject or stopped his car. As Newsuan headed toward the house, Dempsey exited the car with his taser in his hand and told Newsuan to "come here."[1] Newsuan began screaming obscenities at Dempsey and "flailing his arms around."[2] Dempsey could see that Newsuan was completely naked and had nothing in his hands. Dempsey told Newsuan

---

[1] J.A. 102.

[2] *Id.* 103.

4

to "[c]ome here" several more times, but Newsuan continued up the walkway to the house.[3] Newsuan entered the house for approximately two seconds and then emerged back onto the walkway. He was still naked, and Dempsey could see that he did not have a weapon.

Upon emerging from the house, Newsuan began running toward Dempsey and yelling. Dempsey gave two verbal commands to stop. When Newsuan was five feet away, Dempsey fired his taser into Newsuan's chest. Newsuan kept coming forward and grabbed Dempsey's shirt. A violent struggle ensued. Newsuan struck Dempsey in the head multiple times, threw Dempsey up against a parked van, and then pushed him into a parked SUV. As they were wrestling against the SUV, Newsuan reached for Dempsey's service weapon. Dempsey removed the gun from its holster, wedged it between his body and Newsuan's, and, from a distance of no more than two inches, fired two shots into Newsuan's chest. Newsuan attempted to reach for the gun, and Dempsey shot him again in the chest. Still grappling, Newsuan reached for the gun again, and Dempsey shot him again. Newsuan collapsed face down and died. La Torre then emerged from the house screaming and crying; according to Dempsey, this was the first time he encountered her. Dempsey was taken to a hospital, treated for minor injuries, and released the same night.

## ii. Testimony of Juan Cruz

Cruz lived in a street-facing apartment on North Mascher. At around 5:40 a.m., while Cruz was lying in bed,

---

[3] *Id*. 104.

he heard a commotion between two people. He looked out his window and saw Dempsey and Newsuan standing approximately eight feet apart and "screaming at each other."[4] Newsuan "was approaching" Dempsey.[5] When Newsuan closed within four feet of Dempsey, Dempsey shot him with a taser. After being hit with the taser, Newsuan "stopped, stuttered a little bit," and then "just rushed" Dempsey.[6] Newsuan lifted Dempsey up by his belt, began "beating" Dempsey and "slamming" him onto the hood of the squad car, and then pushed Dempsey against a parked vehicle.[7] At that point "it looked like [Newsuan] was going for" Dempsey's gun.[8] Cruz heard a series of gunshots, and Newsuan fell to the ground.

### iii. Testimony of Raimundo Rivera

Like Cruz, Rivera also lived in a street-facing apartment on North Mascher. In the early morning hours, he heard yelling outside his apartment and what sounded like a car door slamming. He also heard a man yelling, "I'm Jehovah. The end is near."[9] Rivera then heard (but did not see) someone being tased. Rivera testified that he did not hear "any statements or yelling or anything immediately preceding the taser," and he never heard Dempsey issue any

---

[4] *Id.* 145.

[5] *Id.*

[6] *Id.* 146.

[7] *Id.* 140, 146-47.

[8] *Id.* 147.

[9] *Id.* 167, 172.

commands to stop or get down on the ground.[10]  Rivera got up and went to the window, where he saw Newsuan "completely naked, rushing over to the police officer."[11]  Newsuan "slam[med] the officer against his patrol car and grab[bed] him by the neck and start[ed] pummeling his head against the car."[12]  Newsuan "reach[ed] for" Dempsey's gun.[13]  While Newsuan "had him by the neck," Dempsey unholstered the gun and shot Newsuan three times at close range, at which point Newsuan fell to the ground.[14]

iv. Testimony of Christina La Torre

La Torre testified that on the night of April 21, Newsuan showed up at her house high on PCP[15] and acting paranoid. Over the course of the night, Newsuan became progressively more agitated, running out of the house and into the street several times and yelling nonsensical phrases.  At some point around sunrise, Newsuan removed his clothes and walked back onto North Mascher.  Some minutes later, Dempsey's cruiser started coming up the block.  La Torre, who was standing near the doorway of her home, told Newsuan to go inside to avoid arrest.  Newsuan began walking toward the house.  According to La Torre, Dempsey pulled up and asked her "what's the problem."[16]  At this point, Newsuan was "standing right there and trying to go

---

[10] *Id.* 168, 175-76.

[11] *Id.* 168.

[12] *Id.*

[13] *Id.*

[14] *Id.* 169.

7

into the house."[17]  La Torre told Dempsey, "he's on PCP" and "he needs to be 302'd"—meaning, in police code, that Newsuan needed to be involuntarily committed to a mental health facility.[18]  Dempsey told her, "don't worry about it, everything is under control."[19]  He also instructed her not to let Newsuan into the house because there might be weapons inside.

Dempsey began walking from the street toward the house.  As he did so, he said to Newsuan, "hey you, come here."[20]  Newsuan "didn't say anything" but just "star[ed] at" Dempsey.[21]  Dempsey walked up the path to the house and repeated the command "to come towards him."[22]  According to La Torre, Newsuan "just look[ed] at" her.[23]  Dempsey backed up, stepped down onto the pavement, and asked

---

[15] PCP is the common abbreviation for phencyclidine, "a controlled substance which causes hallucinations and serious psychological disturbances."  *Guilbeau v. W.W. Henry Co.*, 85 F.3d 1149, 1164 n.41 (5th Cir. 1996) (citing R. SLOANE, THE SLOANE-DORLAND ANNOTATED MEDICAL LEGAL DICTIONARY 545 (1987)).

[16] *Id*. 203.

[17] *Id*.

[18] *Id*.

[19] *Id*.

[20] *Id*. 204.

[21] *Id*.

[22] *Id*.

[23] *Id*.

Newsuan if he could hear him.  Newsuan "started walking" toward Dempsey.[24]  According to La Torre, "[a]s he started approaching the police officer, [Dempsey] tased him."[25]  At the time Dempsey tased him, Newsuan was not running at Dempsey, but rather "walking in response to the officer telling him to come here."[26]

Upon being tased, Newsuan's "body started convulging [sic], like shaking."[27]  Newsuan reached up and pulled the taser prongs from his body, at which point Dempsey drew his gun and began backing away from Newsuan.  Newsuan was "just staring" at Dempsey.[28]  La Torre ran back into the house, grabbed her phone, and began calling Newsuan's mother and brother.  Through the window, she could see Dempsey with his gun still drawn, but could not see Newsuan.  La Torre became frightened and ran into her bedroom, meaning that she did not see the physical altercation between Dempsey and Newsuan.  While in the bedroom, she heard four gunshots in rapid succession.  She went back out to the street and saw Newsuan lying in the street.  Newsuan died shortly thereafter.

---

[24] *Id*.

[25] *Id*.

[26] *Id*.

[27] *Id*.

[28] *Id*. 205.

## B. Procedural Background

Plaintiff Geraldine Johnson, as administratrix of Kenyado Newsuan's estate, brought this action under 42 U.S.C. § 1983, alleging that Officer Dempsey used excessive force against Newsuan in violation of the Fourth Amendment and that the City of Philadelphia was liable for Dempsey's actions under *Monell v. Department of Social Services*,[29] Plaintiff also brought state-law claims for assault and battery and wrongful death. After full discovery, the defendants moved for summary judgment.

The District Court granted summary judgment to the defendants. It held that there was no genuine material dispute that Officer Dempsey reasonably used deadly force to defend himself from Newsuan's attack. In response to Plaintiff's argument that Dempsey should have retreated and awaited backup rather than confront Newsuan, the court held that Newsuan's violent attack, and particularly his attempt to take Dempsey's gun, severed any causal link between Dempsey's initial actions at the scene and his subsequent use of lethal defensive force. Because Plaintiff's state-law claims were either contingent on or required a higher showing than the excessive force claim, the District Court dismissed them as well. This appeal followed.

---

[29] 436 U.S. 658 (1978).

## II.  DISCUSSION[30]

A claim that a police officer used excessive force during a seizure is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard."[31]  There is no dispute that Officer Dempsey "seized" Newsuan for Fourth Amendment purposes when he shot and killed him.[32]  The only question is whether Officer Dempsey's use of force was objectively reasonable under the circumstances.[33]  At the summary judgment stage, once we identify the relevant facts and draw all inferences in the non-movant's favor, the reasonableness of an officer's actions "is a pure question of law."[34]

---

[30] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  "[O]ur review of a grant of summary judgment is plenary, and in making that review we use the same standard as a district court: whether there are genuine issues of material fact precluding entry of summary judgment."  *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).  A fact is "material" if it could affect the outcome, and an issue of material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[31] *Graham v. Connor*, 490 U.S. 386, 388 (1989).

[32] *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

[33] *See Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

[34] *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

Before proceeding, it is necessary to clarify our Fourth Amendment standard in deadly-force cases. Following the Supreme Court's lead in *Tennessee v. Garner*,[35] we have previously suggested that an officer's use of deadly force is justified under the Fourth Amendment only when (1) the officer has reason to believe that the suspect poses a "significant threat of death or serious physical injury to the officer or others," and (2) deadly force is necessary to prevent the suspect's escape or serious injury to others.[36] In *Scott v. Harris*, however, the Supreme Court clarified that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'"[37] Rather, *Garner* was "simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation."[38] *Scott* abrogates our use of special standards in deadly-force cases and reinstates "reasonableness" as the ultimate—and only— inquiry. "Whether or not [an officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable."[39] This is not to say that the considerations enumerated in *Garner* are irrelevant to the reasonableness analysis; to the contrary, in many cases, including this one, a proper assessment of the threat of injury

---

[35] 471 U.S. at 3.

[36] *See Abraham*, 183 F.3d at 289.

[37] 550 U.S. 372, 382 (2007).

[38] *Id*. (internal citations omitted).

[39] *Id*. at 383; *see also Acosta v. Hill*, 504 F.3d 1323, 1324 (9th Cir. 2007) (under *Scott*, "there is no special Fourth Amendment standard for unconstitutional deadly force").

or the risk of flight is crucial to identifying the magnitude of the governmental interests at stake. But such considerations are simply the means by which we approach the ultimate inquiry, not constitutional requirements in their own right.

The reasonableness of a seizure is assessed in light of the totality of the circumstances.[40] We analyze this question "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[41]

We begin with a proposition that can scarcely be disputed: once Newsuan began reaching for Dempsey's gun, Dempsey was justified in using deadly force to defend himself. Each of the three witnesses to the fight (Cruz, Rivera, and Dempsey) testified that Newsuan rushed at Dempsey, began violently grappling with him, and slammed Dempsey into multiple cars.[42] Dempsey and Rivera testified that Newsuan struck Dempsey in the head multiple times. All three witnesses agree that Newsuan then attempted to grab Dempsey's gun out of its holster. At that point there was a serious risk that Newsuan would kill Dempsey, and no

---

[40] *Abraham*, 183 F.3d at 289.

[41] *Graham*, 490 U.S. at 396-97.

[42] The fourth witness, La Torre, had retreated to her bedroom and did not see the altercation.

13

reasonable juror could conclude that it was unreasonable for Dempsey to deploy lethal force in response.[43]

This conclusion, however, does not end the inquiry. A proper Fourth Amendment analysis requires us to assess not only the reasonableness of Dempsey's actions at the precise moment of the shooting, but the "totality of circumstances" leading up to the shooting.[44] Building out from this principle, Plaintiff argues that even if Dempsey was justified in using

---

[43] Plaintiff claims that Dempsey was carrying his handgun in a department-issued holster that makes it difficult for someone who is not the officer to remove the gun. Whatever the precise likelihood that Newsuan would have been able to remove the gun, the unrebutted testimony is that Newsuan was violently assaulting Dempsey and striking him repeatedly in the head, despite having been shot point-blank with a taser. Given that the two men were already engaged in a life-threatening physical struggle, Newsuan's attempt to wrest away Dempsey's weapon was ample justification for the use of defensive deadly force in that instant.

[44] *See Abraham*, 183 F.3d at 292 (recognizing that "events prior to a seizure" should "be considered in analyzing the reasonableness of the seizure"); *see also id.* at 291-92 ("[W]e want to express our disagreement with those courts which have held that analysis of 'reasonableness' under the Fourth Amendment requires excluding any evidence of events preceding the actual seizure. . . . [W]e do not see how these cases can reconcile the Supreme Court's rule requiring examination of the 'totality of the circumstances' with a rigid rule that excludes all context and causes prior to the moment the seizure is finally accomplished.").

deadly force after he was attacked, the seizure as a whole was unreasonable because Dempsey should never have confronted Newsuan in the first place. In support of this argument, Plaintiff cites a Philadelphia Police Department directive that instructs officers who encounter severely mentally disabled persons (including persons experiencing drug-induced psychosis) to wait for back-up, to attempt to de-escalate the situation through conversation, and to retreat rather than resort to force.[45] Plaintiff points out that Dempsey knew or should have known that Newsuan was obviously disturbed;[46]

---

[45] Philadelphia Police Directive 136 instructs patrol officers who encounter a severely mentally disabled person to, among other things, "[a]ssess the situation, attempt to de-escalate the situation through communication, take defensive measures, and attempt to maintain a zone of safety"; "[r]equest adequate back up"; "[r]equest a supervisor"; "avoid any immediate aggressive action unless there is an imminent threat to life or physical danger to the [subject], the police, or other civilians present"; and "[a]ttempt to place themselves in a position that does not require taking unnecessary or overly aggressive actions." J.A. 24-25.

[46] Officer Dempsey testified that on each of the five previous occasions he had encountered a naked person in the street, the person had been high on PCP. He could tell these persons were under the influence of PCP because he knew that, "[w]hen someone does PCP they get hot inside. . . . So they take off their clothing and they go outside, and then the appearance of being high. That's what leads me to believe they're on PCP." J.A. 94. Dempsey could not recall whether he suspected that Newsuan was under the influence of PCP, but acknowledged that the radio description of Newsuan's behavior "fits with the symptoms of PCP." *Id*. 101.

15

that Dempsey knew Newsuan was naked and unarmed; and that Dempsey also knew that he had responded to two prior calls to the same area without receiving any indication that the subject was endangering or threatening people. Plaintiff asserts that, under these circumstances, it was unreasonable for Dempsey to flout departmental policy by initiating a one-on-one encounter with Newsuan.

We do not automatically discount Plaintiff's Fourth Amendment argument or the two presumptions on which it rests: that official police department policies may be considered among other things in the reasonableness inquiry[47] and that a "totality of the circumstances" analysis should account for whether the officer's own reckless or deliberate

---

[47] Our sister circuits have split on the question of whether police department policies may be used to assess whether a seizure is reasonable under the Fourth Amendment. *Compare Stamps v. Town of Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016) (police training and procedures "do not, of course, establish the constitutional standard but may be relevant to the Fourth Amendment analysis"), *and Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("Although . . . training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable."), *with Tanberg v. Sholtis*, 401 F.3d 1151, 1163-64 (10th Cir. 2005) ("That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant.").

conduct unreasonably created the need to use deadly force.[48] But there is no need for us to take up such constitutional considerations here, because Plaintiff's claim founders on a more fundamental tort requirement: proximate causation.

Whether or not Dempsey acted unreasonably at the outset of his encounter with Newsuan, Plaintiff must still prove that Dempsey's allegedly unconstitutional actions proximately caused Newsuan's death.[49] Under ordinary tort principles, a superseding cause breaks the chain of proximate causation.[50] In *Bodine v. Warwick*, we recognized that this principle limits Section 1983 liability for an officer's use of force even where the officer's initial actions violate the Fourth Amendment:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they [enter illegally] . . . . Once inside, they

---

[48] *See Abraham*, 183 F.3d at 292 ("[W]e think all of the events transpiring during the officers' pursuit of [the suspect] can be considered in evaluating the reasonableness of [the officer's] shooting."); *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) ("The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." (internal quotation omitted)).

[49] *See Martinez v. California*, 444 U.S. 277, 285 (1980).

[50] *Lamont v. New Jersey*, 637 F.3d 177, 185-86 (3d Cir. 2011); *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1993).

encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry . . . rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause that would limit the officer's liability.[51]

While there is no precise test for determining when a civilian's intervening acts will constitute a superseding cause of his own injury, relevant considerations include whether the harm actually suffered differs in kind from the harm that would ordinarily have resulted from the officer's initial actions; whether the civilian's intervening acts are a reasonably foreseeable response to the officer's initial actions; whether the civilian's intervening acts are themselves inherently wrongful or illegal; and the culpability of the civilian's intervening acts.[52]

Although proximate causation is generally a question of fact,[53] it "becomes an issue of law when there is no

---

[51] *Id* (citations omitted).

[52] *See* Restatement (Second) of Torts § 442 (1965).

[53] *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004).

evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries."[54]  Here, we conclude as a matter of law that Newsuan's violent, precipitate, and illegal attack on Officer Dempsey severed any causal connection between Dempsey's initial actions and his subsequent use of deadly force during the struggle in the street.  Whatever harms we may expect to ordinarily flow from an officer's failure to await backup when confronted with a mentally disturbed individual, they do not include the inevitability that the officer will be rushed, choked, slammed into vehicles, and forcibly dispossessed of his service weapon.  We therefore have little trouble concluding that Newsuan's life-threatening assault, coupled with his attempt to gain control of Dempsey's gun, was the direct cause of his death.

Before continuing on, however, we sound a note of caution.  The question of proximate causation in this case is made straightforward by the exceptional circumstances presented—namely, a sudden, unexpected attack that instantly forced the officer into a defensive fight for his life.  As discussed above, that rupture in the chain of events, coupled with the extraordinary violence of Newsuan's assault, makes the Fourth Amendment reasonableness analysis similarly straightforward.  Given the extreme facts of this case, our opinion should not be misread to broadly immunize police officers from Fourth Amendment liability whenever a mentally disturbed person threatens an officer's physical safety.  Depending on the severity and immediacy of

---

[54] *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 318 (3d Cir. 1999) (quoting *Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 620 (10th Cir. 1998)).

the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual. It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual.[55] Nor should it be assumed that mentally disturbed persons are so inherently unpredictable that their reactions will always sever the chain of causation between an officer's initial actions and a subsequent use of force. If a plaintiff produces competent evidence that persons who have certain illnesses or who are under the influence of certain substances are likely to respond to particular police actions in a particular way, that may be sufficient to create a jury issue on causation. And of course, nothing we say today should discourage police departments and municipalities from devising and rigorously enforcing policies to make tragic events like this one less likely.[56] The facts of this case,

---

[55] *See Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (reasonable jury could conclude that officers should have de-escalated encounter with distraught individual through verbal intervention rather than physical force); *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001) (holding that a civilian's mental status must be considered in determining the reasonableness of a use of force, and observing that, with respect to emotionally disturbed persons, "a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end").

[56] *See* Megan Pauly, *How Police Officers Are (or Aren't) Trained in Mental Health*, The Atlantic, (Oct. 11, 2013) http://www.theatlantic.com/health/archive/2013/10/how-

however, are extraordinary. Whatever the Fourth Amendment requires of officers encountering emotionally or mentally disturbed individuals, it does not oblige an officer to passively endure a life-threatening physical assault, regardless of the assailant's mental state.

Finally, Plaintiff offers an alternative basis for Fourth Amendment liability. In addition to faulting Dempsey for the manner in which he initiated the encounter, Plaintiff suggests that it was also unreasonable for Officer Dempsey to shoot Newsuan with his taser during the lead-up to the fight. This contention is buttressed by La Torre's testimony that Newsuan was simply walking toward Dempsey in compliance with Dempsey's orders when Dempsey tased him, as well as by Rivera's testimony that he never heard Dempsey issue any commands before tasing Newsuan. But even if we were to deem this particular use of force unreasonable, the requisite causal connection between the taser strike and Dempsey's later use of deadly force would still be lacking.

According to La Torre, after Dempsey shot Newsuan with the taser, Newsuan reached up and pulled the taser prongs from his body. Dempsey then drew his gun and began backing away from Newsuan, while Newsuan "just star[ed]" at him.[57] La Torre ran back inside and called Newsuan's mother and brother on the phone. The last thing

---

police-officers-are-or-aren-t-trained-in-mental-health/280485/ (last visited August 16, 2016) (discussing prevalence, success, and challenges of so-called Crisis Intervention Training for police officers).

[57] J.A. 205.

she saw from the window was Dempsey standing with his gun drawn. This testimony establishes that Newsuan was essentially unfazed by the taser strike. According to La Torre, Newsuan simply removed the taser prongs and stared at Dempsey in a continued standoff that lasted long enough for La Torre to place two phone calls from inside the house. Therefore, even after drawing all inferences in Plaintiff's favor, no reasonable juror could conclude that Newsuan's subsequent physical attack was an involuntary or foreseeable defensive response to the taser strike described by La Torre.

More importantly, La Torre did not see any part of the physical fight, including who initiated it or how Dempsey and Newsuan went from a gun-drawn standoff, as recounted by La Torre, to a close-quarters fight. What this means is that the only evidence concerning how Newsuan and Dempsey came into physical contact is the unrebutted testimony of Dempsey, Cruz, and Rivera. Each of them testified that Newsuan rushed at Dempsey unprovoked and that the taser barely slowed Newsuan in his attempt to grab Dempsey. Each of them also testified that Newsuan slammed Dempsey into parked cars and reached for Dempsey's gun. In the absence of a competing account, those undisputed actions are superseding causes that absolve Dempsey of any liability for his initial conduct.

## III. CONCLUSION

For the foregoing reasons, we conclude that Office Dempsey's use of deadly force was reasonable under the circumstances, and that any allegedly unreasonable decisions he made during his initial encounter with Newsuan did not

22

proximately cause Newsuan's death. Our dismissal of Plaintiff's Fourth Amendment claim requires the dismissal of her remaining *Monell* and state-law claims as well.[58]

We will therefore affirm the judgment of the District Court.

---

[58] *See* Pl. Br. 33-34 ("Plaintiff agrees that if there is no claim against Officer Dempsey under the Fourth Amendment then Plaintiff has no right to assert its state claims against Dempsey and its *Monell* claim against the City."); *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) (municipality cannot be held liable on a *Monell* claim absent an underlying constitutional violation); *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (under Pennsylvania law, the "reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery"); *Sunderland v. R.A. Barlow Homebuilders*, 791 A.2d 384, 390-91 (Pa. Super. Ct. 2002) ("A wrongful death action is derivative of the injury which would have supported the decedent's own cause of action and is dependent upon the decedent's cause of action being viable at the time of death.").

*Johnson v. City of Philadelphia*

No. 15-2346

_____

ROTH, <u>Circuit Judge</u>, dissenting:

While the members of the majority may be satisfied that Newsuan's attack on Officer Dempsey was sufficient to sever any causal chain, I believe that Newsuan's reaction was, unfortunately, all too foreseeable. Directive 136—the police regulation that Officer Dempsey supposedly violated—states that its main objective "is to aid and protect the interests of the [mentally disturbed person], innocent bystanders, and family members in the immediate area, without compromising the safety of all parties concerned, including the police officers. This is best accomplished by DE-ESCALATING THE INCIDENT" (emphasis in original).[1] The purpose of regulations like Directive 136 is clear—to reduce the risk of a deadly confrontation with an extremely vulnerable population. That such a regulation is necessary to reduce the risk of a deadly confrontation demonstrates that

---

[1] While this directive is cited as "Directive 136" by both parties, as of January 9, 2015, the directive appears under the number 10.9. J.A. 21–29 (being cited as Directive 136); *Severely Mentally Disabled Persons*, Philadelphia Police Department (Jan. 9, 2015), *available at* https://www.phillypolice.com/assets/directives/D10.9-SeverelyMentallyDisabledPersons.pdf (being cited as Directive 10.9).

1

deadly confrontations are a foreseeable result of ignoring the regulation.

Viewing the facts before us in a light most favorable to the non-movant, Officer Dempsey, ignoring the Philadelphia Police Department's calculated use of caps lock, escalated the incident. Facing a naked, unarmed man who by all accounts had not been reported to the police as an "immediate threat to life or physical danger" to anyone, Officer Dempsey approached Newsuan and beckoned him to "come here," without backup, in violation of police regulation. By Dempsey's own account, his approach was not made to apprehend and secure Newsuan, but was made because Dempsey "wanted to see if [Newsuan] was in some type of distress. He obviously needed some type of care."[2] By knowingly violating a police department regulation designed to keep mentally disturbed individuals safe, Dempsey set into motion the confrontation that ultimately led to Newsuan's death – a confrontation whose foreseeability was the impetus for the establishment of Directive 136.

Our limited precedent on the issue of superseding causes in excessive force cases is instructive. In *Lamont v. New Jersey*, we held that an individual's quick hand movement—perceived by officers as drawing a weapon—occurring after officers had violated police procedures to pursue the individual, constituted a superseding cause.[3] In so holding, we noted that a contrary holding would "tend to deter police officers 'from approaching and detaining

---

[2] J.A. at 102-03.
[3] 637 F.3d 177, 186 (2011).

2

potentially violent suspects.'"[4]   But the officers in *Lamont* were pursuing an individual who, they expected, was armed and potentially dangerous.  The officers were so informed when they chose to violate police procedures in pursuing him.  Such cannot be said of Officer Dempsey here, as Newsuan was clearly unarmed and had not been exhibiting violent conduct prior to their interaction.  There is an important distinction between these two types of cases—one in which an officer, through his conduct, creates the situation that calls for the use of force, and one in which the officer's misconduct, while perhaps factually linked to the eventual use of force, does not contribute to the "dangerous situation."[5]  Additionally, holding that Newsuan's behavior was not a superseding cause would not create the perverse deterrent effects we feared in *Lamont*:  to the contrary, deterring police officers from approaching mentally disturbed suspects in a way that may compromise the safety of either the officer or the individual is an end we should seek to achieve, rather than avoid.

I am also not persuaded that Newsuan's attack was an unforeseeable result of his being tased by Officer Dempsey.  Taking the facts in the light most favorable to the non-movant, Dempsey was aware that Newsuan was on PCP at the time of their encounter.   The Philadelphia Police Department teaches its officers that a taser strike may fail to

---

[4] *Id.* (quoting *Hundley v. District of Columbia*, 494 F.3d 1097, 1105 (D.C. Cir. 2007)).

[5] *See Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993) (officer who jumped in front of a speeding car, then used deadly force to stop driver, would not be entitled to qualified immunity).

3

subdue a suspect on PCP due to the drug's effects on pain tolerance.[6] It was therefore foreseeable to Officer Dempsey that his taser would be ineffective against Newsuan. The most favorable account of the facts prior to Newsuan's being tased is that Newsuan was "approaching" Officer Dempsey— presumably in response to Dempsey's request that Newsuan "come here." A jury could reasonably conclude that Officer Dempsey, by firing his taser, took an "immediate aggressive action" in violation of police department regulations and in doing so escalated the situation and created a risk of harm to both himself and to Newsuan.

The death of individuals with mental health problems at the hands of the police continues to occur across the country.[7] The first line of defense against these incidents is the establishment of police regulations designed to prevent interactions between police officers and mentally disabled people from escalating into deadly confrontations. Declaring that an officer who disregards such a regulation has not proximately caused a violent confrontation that the regulation is in place to prevent renders the regulation toothless. Given the available factual accounts of the events leading up to Newsuan's eventual death, including the possible disregard of a regulation that was designed to guard against violent confrontations, I cannot say that "there is no evidence from which a jury could reasonably find the required proximate,

---

[6] J.A. 244.

[7] *E.g.*, Kate Mather and James Queally, *More Than a Third of People Shot by L.A. Police Last Year Were Mentally Ill, LAPD Report Finds*, L.A. Times (Mar. 1, 2016), http://www.latimes.com/local/lanow/la-me-ln-lapd-use-of-force-report-20160301-story.html.

causal nexus between the careless act and the resulting injuries."[8]

For the above reasons, I respectfully dissent. I would reverse the judgment of the District Court and remand this case for further proceedings.

---

[8] *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 318 (3d Cir. 1999) (quoting *Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 620 (10th Cir. 1998)).