NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3338
_____

JAMES S. THOMPSON,
                                        Appellant

v.

NORMAN HOWARD, Redstone Township Policeman;
ROY MEHALIK, Luzerne Township Policeman;
TROOPER BROADWATER, PA State Police
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-09-cv-1416)
District Judge:  Hon. Lisa P. Lenihan
_____

Argued
September 9, 2016

Before:  JORDAN, VANASKIE, and KRAUSE, *Circuit Judges*.

(Filed:  February 17, 2017)
_____

Caitlin R. Garber
Reed Smith
225 Fifth Avenue – Ste. 1200
Pittsburgh, PA   15222

Michael P. Yingling   [ARGUED]
Reed Smith
10 S. Wacker Drive – 40th Fl.
Chicago, IL   60606
        *Counsel for Appellant*

Louis C. Long   [ARGUED]
Thomas P. McGinnis
Karin M. Romano
Thomas Thomas & Hafer
525 William Penn Place – Ste. 3750
Pittsburgh, PA   15219
        *Counsel for Appellee*

_____

OPINION[*]
_____

JORDAN, *Circuit Judge*.

The question presented to us is whether a police officer acts in violation of clearly established law when he shoots at a person who, after crashing a car into an occupied police cruiser, is fleeing blindly at high speed in a residential neighborhood, driving over sidewalks and residents' lawns. We conclude that, under Supreme Court precedent, there is no clearly established law that makes the use of deadly force in such a scenario excessive, and the officer is therefore entitled to qualified immunity.

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

2

## I. BACKGROUND

### A. Factual Background[1]

In Republic, Pennsylvania, on the evening of March 9, 2008, Plaintiff James S. Thompson was a passenger in a car being driven by his girlfriend, Rae Lynn Sigwalt. Defendant Norman Howard, an on-duty police officer, recognized Sigwalt, whom he had encountered before. Howard was aware that Sigwalt was the subject of an outstanding arrest warrant, and he began to follow her. When Sigwalt made a turn without signaling, he pulled her over.

After asking for Sigwalt's license and registration, Howard confirmed that Sigwalt was still wanted for arrest and asked her to step out of her vehicle. Thompson asked why they were being stopped, and Howard told him to "shut up." (App. at 2.) Howard then handcuffed Sigwalt and put her into the police car.

At that point, according to Howard, he saw Thompson turning his head, moving about, and appearing to reach for something.[2] He also alleges that he observed Thompson's hands down below the seat. He therefore asked Thompson for identification

---

[1] In this procedural posture, we interpret the facts in the light most favorable to Thompson. *Curley v. Klem*, 298 F.3d 271, 279–80 (3rd Cir. 2002). For the sake of narrative clarity, we nevertheless highlight some points of disagreement.

Because Appellant limits his claim of excessive force on appeal to only the shooting in response to Thompson's high-speed flight, the factual allegations as to that portion of the encounter are the ones directly relevant to our inquiry. By way of background, however, we recount here the other factual circumstances alleged to lead up to the flight and shooting.

[2] Thompson contests that he was making reaching movements and in his counter statement alleges that "he was simply sitting in the passenger seat of the [car]." (App. at 932.)

and told him to get out of the car. Howard then performed a pat down of Thompson, which revealed no weapons.

Thompson gave Howard his name and social security card. Howard then checked Thompson's name with county dispatch, using his portable radio. Howard's inquiry returned no outstanding warrants, but he was told by Officer Roy Mehalik, the police chief of a neighboring township, that he "might want to use some caution with [Thompson]," (*id.* at 4), and that Thompson was "dangerous" (*id.* at 671). Mehalik said that he would come to the scene to help Howard. When he heard Mehalik's voice, Thompson became agitated because, as he later explained, Mehalik had bullied him as a child.

Howard told Thompson that, if there was no outstanding warrant for his arrest, he would be free to go. Nevertheless, Howard insisted that Thompson be handcuffed. Thompson says he was never told why that was necessary and that, when questioned, Howard cursed at him. Thompson refused to submit to the handcuffs and insisted that there was no reason that he should be cuffed.

After Thompson repeatedly refused to be cuffed, Howard threatened to use his taser. Howard claims that Thompson then moved towards the passenger side of the car,[3] leading Howard to fear that there might be a weapon in the vehicle. Howard decided to use his taser and did so twice, but neither attempt affected Thompson. During one of those attempts, Howard accidentally shocked himself. He began to hurl racial epithets at

---

[3] Thompson disputes this point.

Thompson and threatened to kill him, all while chasing him around the car and ordering him to get on the ground. During the chase, he struck Thompson repeatedly with a baton.

After circling the car several times, Thompson jumped into the driver's seat, locked the door, and started the engine with the keys that had been left in the ignition. Howard asserts that he could not see what Thompson was doing with his hands, so he smashed the glass of the driver's side window with his baton. Howard reached into the car, began to again hit Thompson with the baton, and threatened to shoot him. Meanwhile, Mehalik had arrived at the scene and parked nearby.

Thompson continued his efforts to escape. He put the car in gear and drove away while Howard's arms were still inside the vehicle. Leaning towards the passenger side to avoid baton blows, he steered into Mehalik's police cruiser just as Mehalik was opening the driver's side door. The collision caused only minor damage to the cruiser and did not injure Mehalik.[4] The parties dispute whether Howard could see that Mehalik had not been struck by the vehicle. Howard claims that he could not see what happened to

---

[4] The impact was sufficiently severe to support Thompson's conviction in state court for aggravated assault. Under Pennsylvania law, aggravated assault is defined to require an intentional act that places another in danger of serious bodily injury. (*See* App. at 472 (explaining to the jury that aggravated assault required an intentional attempt to inflict serious bodily injury)). Thompson's conviction appears to conclusively establish that he intentionally hit Mehalik's vehicle with sufficient force to put him at risk of serious injury. *See Folino v. Young*, 568 A.2d 171, 172 (Pa. 1990) (explaining that "operative facts necessary for non-summary criminal convictions [may] be admitted as conclusive facts in civil suits arising from the same event"); *cf. Anela v. City of Wildwood*, 790 F.2d 1063, 1068 (3d Cir. 1986) ("The federal court, in determining the collateral estoppel effect of a state court proceeding, should apply the law of the state where the criminal proceeding took place and also ascertain whether the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue decided in the state court.").

5

Mehalik and feared for his fellow officer's safety. Thompson argues to the contrary that, because Howard was standing in the middle of the road, he could have easily seen Mehalik throughout the encounter.

In an attempt to get around Mehalik's vehicle, Thompson then drove across a resident's yard and driveway. He admits that his gas pedal was pressed "all the way to the floor" and that he was not looking at the road because he was still leaning towards the passenger side of the vehicle. (*Id.* at 249.) When Thompson was about 10 to 12 feet away,[5] Howard pulled out his handgun and fired five shots at him. Thompson asserts that he was driving away from Howard the whole time. Mehalik, claiming that he believed the vehicle was about to strike Howard, also fired one shot at Thompson. At the time both officers were shooting, there were no bystanders visible nor any moving cars in the vicinity.

None of the six bullets directly hit Thompson. He later said, somewhat inconsistently, that one grazed his head but also that he never claimed to be injured in any physical manner. He continued driving away, passed through another resident's yard, and nearly struck a parked vehicle. As he drove, he continued to keep his head down to avoid the gunfire. Thompson was not arrested that day but voluntarily appeared before a magistrate a few days later.

---

[5] During his testimony in the subsequent criminal trial in Pennsylvania court, Thompson said that the shots were fired almost "instantaneously" after he hit Mehalik's car. (App. at 450.)

6

### B. Procedural Background

The legal consequences of the melee began immediately. Thompson was charged in state court with two counts of aggravated assault and counts for simple assault, resisting arrest, and criminal mischief. The charge of resisting arrest was dismissed because the judge concluded that Howard's attempt to handcuff Thompson was not a lawful arrest. A jury ultimately found Thompson guilty of one count of aggravated assault, and of simple assault and criminal mischief.

Thompson subsequently filed this action under 42 U.S.C. § 1983. He sued Howard and Mehalik, the townships for which they worked, another officer he claimed filed a false police report, the Pennsylvania State Police, the Commonwealth of Pennsylvania, and Fayette County. The District Court dismissed most of Thompson's claims, including those against Mehalik.[6] The only claim that remained was the Fourth Amendment excessive force claim against Howard.

After discovery, Howard filed a motion for summary judgment, which the Court granted. The Court ruled that "[w]hen balancing the force used by [Howard] against the safety of the officers at the scene and the possible harm to those in the immediate vicinity, [Howard's] use of force was objectively reasonable." (*Id.* at 18). In the alternative, it held that, "even if a reasonable jury could conclude from this record that any of the force used was excessive under the particular facts of this case, [Howard] is

---

[6] The District Court relied heavily on the conclusion that Thompson's criminal conviction conclusively established that Officer Mehalik's life had been put in danger through Thompson's actions. *See supra* note 3.

entitled to qualified immunity." (*Id.*) Thompson filed the present appeal and focuses his arguments on Howard's use of a firearm, rather than the taser and baton.

## II. DISCUSSION[7]

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The inquiry has two parts. One question is whether the plaintiff has alleged sufficient facts to "make out a violation of a constitutional right." *Id.* at 232. The other question is "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Id.* (internal quotation marks omitted). It is within our "sound discretion," *id.* at 242, to tackle these steps "in the order we deem most appropriate for the particular case before us." *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015).

Here, we exercise that discretion to affirm on the basis of the second part of the qualified immunity test, without deciding whether Howard's actions did in fact violate Thompson's constitutional rights. This is a case "in which the constitutional question is so factbound that [a] decision provides little guidance for future cases," *Pearson*, 555 U.S. at 237, at least as to the constitutionality of the police conduct. Because answering the first question will be of relatively little value, the doctrine of constitutional avoidance

---

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291.

leads us to decide the case by asking whether the right was clearly established. *Id.* at 241 ("Adherence to [the] two-step protocol departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality ... unless such adjudication is unavoidable." (internal quotation marks omitted)). Thus, we only address whether it would be clear to a reasonable officer at the time of the incident that shooting at a person fleeing in a vehicle, with the gas pedal pressed "all the way to the floor," after striking an occupied police vehicle was an excessive use of force.

To decide if a use of force was "objectively reasonable[,]" we consider the "severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). An officer's use of deadly force is excessive when it is not "objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others[.]" *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999).

Here, we focus solely on the shooting that followed Thompson's vehicular flight.[8] In that light, and under controlling Supreme Court case law and the totality of the

---

[8] Because Thompson, on appeal, has cabined his claim of excessive use of force to the shooting, we do not have occasion to consider whether a claim based on the force used by Howard earlier in the encounter or the course of Howard's conduct viewed as a whole would vitiate qualified immunity. Thompson's allegations regarding Howard's

circumstances, we cannot say it was objectively unreasonable for Howard to believe that resort to lethal force was warranted. That threshold is a high one. Qualified immunity exists because "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly" believe that their actions are legally justified. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Qualified immunity "gives ample room for mistaken judgments" and "protect[s] all but the plainly incompetent or those who knowingly violate the law." *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010) (internal quotation marks and citations omitted). Therefore, qualified immunity applies unless the conclusion that the officer acted unreasonably is "beyond debate." *Mullenix*, *v. Luna*, 136 S. Ct. 305, 309 (2015). In other words, it applies unless "every reasonable official would [have understood] that what he [was] doing violate[d]" the right at issue. *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and citation omitted) (first alteration in original). While "[w]e do not require a case directly on point, … existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted).[9]

---

lack of self-control and use of racial epithets and death threats are obviously repugnant, and while we recently held in *Johnson v. City of Philadelphia*, 837 F.3d 343 (3d Cir. 2016), that a superseding cause may limit an officer's liability even where a police officer has arguably acted unreasonably, *id.* at 351-52, we did not rule out the possibility that egregious conduct rising to the level of deliberate provocation may be sufficient to undermine immunity. *Id.* at 352-53. Given that the use of force claim here was limited by Thompson to the shooting, we need not decide whether Howard's earlier conduct eliminated the protection afforded by qualified immunity.

[9] The Supreme Court has issued several decisions in the past few years warning courts against defining clearly established law at a high level of generality. In addition to *Brosseau v. Haugen*, 543 U.S. 194 (2004), and *Mullenix v. Luna*, 136 S. Ct. 305 (2015),

Far from putting the question beyond debate, two Supreme Court cases involving the use of lethal force and high speed flight illustrate well "the sometimes hazy border between excessive and acceptable force." *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004).

In *Brosseau v Haugen,* an officer pursued a suspect who ran away and started a car. 543 U.S. at 196. The officer tried to stop him by pounding on the car window with a handgun. *Id.* The suspect still began to drive away and the officer shot and killed him. *Id.* The factual similarities to this case are significant in many respects, and yet the Supreme Court concluded that it was not clearly established that the use of force was improper. *Id.* at 201.

Likewise, in *Mullinex v Luna*, the Court reversed a denial of summary judgment and held that the officer in question, Mullinex, was entitled to qualified immunity when he shot at "a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at [a road block]". 136 S. Ct. at 309. The "correct inquiry," the Supreme Court instructed, was "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation [the officer] confronted: whether to shoot a disturbed felon, set on avoiding capture

---

which are discussed in greater detail herein, at least five other Supreme Court opinions have recently reversed a denial of qualified immunity because the court below relied on overly general conclusions. *White v. Pauly*, 580 U. S. ____ (2017); *City and County of San Francisco v. Sheehan*, 575 U. S. ___, ___, n. 3 (2015); *Plumhoff v. Rickard*, 572 U. S. ___, ___ (2014); *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012); *Ashcroft v. al-Kidd*, 563 U. S. 731, 742 (2011).

through vehicular flight, when persons in the immediate area are at risk from that flight," and the answer the Court gave was that it was not: "Far from clarifying the issue, excessive force cases involving car chases reveal the hazy legal backdrop against which Mullinex acted." *Id.* at 309 (internal quotation marks omitted).

After reviewing its excessive force cases, the Court went on to observe that it "has . . . never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Id.* at 310. The reasonableness of an officer's decision to use force against a suspect to protect other people did not turn on whether the suspect was in fact about to come upon other people or whether the officer knew with certainty that such a circumstance would develop. Rather, the Court recounted, it had held previously that an officer did not violate clearly established law and thus was entitled to qualified immunity "when she shot a fleeing suspect out of fear that he endangered 'other officers on foot who [she] *believed* were in the immediate area,' 'the occupied vehicles in [his] path,' and 'any other citizens who *might* be in the area.'" *Id.* at 309-10 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)) (alterations in original). And it reiterated that officers did not violate the Fourth Amendment by using deadly force when a fugitive "posed an actual and imminent threat to the lives of any pedestrians who might have been present," *id.* at 310 (quoting *Scott v. Harris*, 550 U.S. 372, 384 (2007)), or "pose[d] a deadly threat for others on the road." *Id.* (quoting *Plumhoff v. Rickard*, 132 S. Ct. 2012, 2022 (2014)) (alteration in original). Because existing precedent did not place beyond debate the conclusion that

12

Mullinex had acted unreasonably, the Court concluded that the right which had allegedly been violated was not "clearly established." *Id.* at 309-10 (internal citation omitted).

So too here. It is beyond dispute that, by the time Howard began shooting, Thompson had already demonstrated a reckless disregard for the safety of others by crashing into Mehalik's police car as Mehalik was getting out of it. Thompson then compounded that recklessness by blindly fleeing with the gas pedal "all the way to the floor," driving over sidewalks and lawns in a residential neighborhood. (App. at 693, 1011, 1012). Thus, regardless of whether Thompson was at that moment driving towards or away from the officers, it was not objectively unreasonable for Howard, when confronted with Thompson's dangerous, chaotic, high-speed flight, to believe that Thompson posed a serious risk to persons who might be in the area and to resort to deadly force to prevent such persons from being injured. *See, e.g.*, *Mullinex*, 136 S. Ct. at 310-11; *Brosseau*, 543 U.S. at 197. As in *Mullinex*, we cannot say that Supreme Court precedent "squarely governs" the facts here; nor can we say that "only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have perceived a sufficient threat and acted as [Howard] did." *Mullinex*, 136 S. Ct. at 310 (citation omitted) (alteration in original).[10]

---

[10] It is worth pointing out how closely Thompson's arguments echo Justice Stevens's solitary dissent in *Brosseau*. 542 U.S. at 202 (Stevens, J., dissenting). Justice Stevens felt that "the risk of … an accident surely did not justify an attempt to kill the fugitive." *Id.* at 204-05. He argued, just as Thompson has, that since there were disputed facts as to the reasonableness of the officer's actions, immunity was improper. *Id.* at 206-07. And he even echoed Thompson's claims that qualified immunity was improper because immunity was only proper for "uncertainty about the law" rather than for "fact-specific question[s]" (citation omitted). *Id.* at 206. But Justice Stevens did not get the

Contrary to Thompson's assertions, our own case law is also in accord. While he argues that *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), requires a different result, that decision is distinguishable in two ways. First, *Abraham* did not address qualified immunity and instead found that summary judgment was inappropriate due to a material dispute of fact. *Id.* at 294 (concluding that "a jury will have to determine, after deciding what the real risk to [the officer] was, what was objectively reasonable for an officer in [that officer's] position to believe about her safety, giving due regard to the pressures of the moment"). Therefore, it is not certain whether the court would have concluded that no reasonable officer could have responded as the officer did there. The other salient difference is that the plaintiff in *Abraham* hit a parked, unmanned car, and there was a material dispute of fact as to whether he posed a risk to any officer at all. *Id.* at 283. In contrast, Thompson hit a marked and manned police vehicle with sufficient force to justify an aggravated assault conviction, so there was no doubt that Thompson had at least posed a serious risk when he crashed into the car. Those differences are highly material and mean that *Abraham* is not controlling.

In conclusion, we again emphasize the narrow scope of our holding. We do not say that Howard was right to have fired at Thompson, or that Howard's earlier actions were justifiable. Instead, we simply conclude that, in light of precedent such as *Mullenix* and *Brosseau*, it is not beyond debate that a reasonable officer in Howard's shoes could

vote of any of the other members of the Supreme Court. Thompson's position would require us to ignore what the Supreme Court said in *Brosseau* and instead to embrace its dissent – which we clearly cannot do.

14

have thought the use of deadly force was lawful.  Accordingly, we cannot say that it was clearly established that Howard's decision to fire at Thompson involved excessive force. Qualified immunity applies in exactly such circumstances.

**III.    CONCLUSION**

For the foregoing reasons, we will affirm the District Court's order of dismissal.