**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2896
_____

JOAN MULLIN, Administratrix of the Estate of Robert
Mullin, deceased and Joan Mullin, individually

v.

ADMINISTRATOR KAREN BALICKI; ROBERT
PATERSON; DIRECTOR MARIE DUNLAP-PRYCE;
JANE BYRD, LPN; ERIN MARUSKY, R.N.; OFFICER
DIMLER; NURSE BEATRICE TEEL; KINTOCK GROUP;
COUNTY OF MERCER; JOHN DOES 4-10 (as yet
identified and unknown governmental, county, or state
officials, supervisors, agents or employees); ABC ENTITIES
1-10 (as yet identified and unknown governmental, county, or
state officials, supervisors, agents or employees)

Joan Mullin,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 3-11-cv-00247)
District Judge: The Honorable Mary Little Cooper
_____

Argued on June 7, 2017

Before: CHAGARES, VANASKIE, and FUENTES, *Circuit Judges*

(Opinion Filed: November 6, 2017)

Shelley L. Stangler, Esq. **[Argued]**
Law Offices of Shelly L. Stangler, P.C.
155 Morris Avenue, Suite 202
Springfield, NJ 07081
    *Counsel for the Appellant*

Gregory R. Bueno, Esq. **[Argued]**
Daniel M. Vannella, Esq.
Office of Attorney General of New Jersey
25 Market Street, P.O. Box 112
Trenton, NJ 08625
    *Counsel for the Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

A little over two years into the civil-rights suit brought by Joan Mullin ("Mullin") over the tragic prison suicide of her son, Robert Mullin ("Robert"), Mullin's attorney received a discovery document with the potential to reshape the case. A previously undisclosed investigative report about the night

2

Robert died contained statements by fellow New Jersey inmates about a prison guard who allegedly refused Robert's requests for psychiatric assistance—and urged Robert to kill himself instead. But while Mullin's attorney *received* this report mid-case, it was not reviewed in a timely fashion. Instead, due to a clerical error, the disc containing the relevant disclosures was misfiled, and not fully accessed until about ten months later. By that time, Mullin's operative complaint—premised on a less direct knew-or-should-have-known theory of Robert's vulnerability to suicide—had already been dismissed in large part. The District Court denied Mullin's request for leave to amend her complaint, due in part to the delay caused by counsel's error and, after additional motion practice, granted summary judgment in favor of the one remaining defendant, bringing the litigation to a close.

Mullin's appeal encompasses both the dismissal of her operative complaint and the order denying further leave to amend. The latter is the focus of this opinion. For the reasons set forth below, we conclude that the decision denying leave to amend amounted to an impermissible exercise of discretion. Some of the factors relied upon to deny leave are not supported by the record or are at odds with our case law. And while we do not intend to minimize counsel's mistake, it does not, standing alone, support denying leave to amend. Accordingly, we will vacate the order denying leave to amend and will remand for further proceedings.

## I.   BACKGROUND[1]

### A. Robert's Death and Mullin's Initial Investigation

During the early morning hours of January 17, 2009, New Jersey prisoner Robert Mullin hanged himself with a bedsheet that he had fashioned into a noose. The twenty-nine-year-old Robert had been in and out of prison for the better part of a decade, in part due to his ongoing struggles with substance abuse. While serving out his latest sentence at a halfway house, Robert was found in possession of contraband. As a result, he was transferred to New Jersey's Central Reception & Assignment Facility ("Assignment Facility"), where he was assessed and assigned to an area of the facility that did not feature extensive or individualized supervision by staff. It was there, in his Assignment Facility cell, that he took his own life—less than a day after entering the Facility.

In the aftermath, Robert's mother, Joan Mullin, sought answers. What few were given, however, were incomplete and at times inaccurate. In one instance, she was told that her son had died at a completely different facility, the Trenton Psychiatric Hospital—an error repeated on his death certificate. Despite some slow progress, she continued to lack key information about the final days and hours of Robert's life and the people and entities to whom his care was entrusted.

---

[1] The litigation has been unusually confusing, complex, and—to be frank—frustrating, due in part to the swirling gyre of overlapping motions practice. We simplify when practical.

### B. Mullin Files the Original Complaint in January 2011

Despite this state of affairs, Mullin filed suit in the District of New Jersey shortly before the two-year mark of Robert's death,[2] raising state tort claims and constitutional vulnerability-to-suicide claims (the latter of which is a variation on a constitutional claim alleging deliberate indifference to a serious medical need). The complaint focused on the defendants' alleged failure to provide Robert with the level of care, treatment, and monitoring that he needed, and that was required by prison policy for someone with his history of depression, self-harm, and substance abuse. Mullin alleged that Robert was placed in a cell that was inadequately supervised and altogether inappropriate for a person with a history of suicide attempts—a decision made all the more inexcusable by the medical history and recent relapse into drug addiction that his custodians failed to properly review or otherwise heed.

Mullin named a variety of defendants, several of whom were employed by the State of New Jersey and represented by the New Jersey Attorney General's office. We will refer to these as the "State Defendants."

### C. Mullin Twice Amends Her Complaint

Mullin twice amended her complaint to both flesh out the facts—in part to account for interim discovery she

---

[2] Although Mullin sued both in her individual capacity and as the administratrix of Robert's estate, a dual role reflected in our caption, the claims now on appeal are those brought in her representative capacity on behalf of Robert's estate.

received from non-State defendants—and to modify the list of defendants. In particular, Mullin sought to add Officer Nicholas Dimler, the Assignment Facility guard who, according to the medical examiner's report, was the last person (who wasn't a fellow inmate) to see Robert alive—and the one who later discovered his body.

Mullin's first attempt to amend, filed in response to the defendants' initial Rule 12 motions, was granted in part and denied in part. Among other things, the Magistrate Judge determined that the proposed amended complaint lacked sufficient detail of Dimler's involvement in Robert's death and did not state a plausible claim for relief against him. Under these constraints, Mullin filed her first amended complaint ("FAC") in December 2011.

After obtaining additional discovery, Mullin again asked to amend in July 2012, arguing in part that she could now plead a viable claim against Officer Dimler. Mullin alleged essentially that Officer Dimler knew or should have known of Robert's history of suicide and psychiatric illness; that Dimler failed to review records that would have alerted him to Robert's condition; and that Dimler failed to follow prison policies and reasonable practices pertaining to inmates with Robert's vulnerabilities. This time, the Magistrate Judge allowed Mullin's amendment to include the revised allegations against Officer Dimler, finding them to be "plausible" instead of merely possible.[3] Mullin's Second Amended Complaint ("SAC"), the operative complaint for the remainder of the litigation in the District Court, was then filed in September 2012. The SAC, like its predecessors, was met with Rule 12 motions to dismiss.

---

[3] Order at 7, ECF No. 101.

6

## D. While the Motions to Dismiss are Pending, Mullin Receives New Evidence in Discovery

Although Mullin had obtained some discovery by the time the SAC was filed—almost two years into the litigation—she had received no disclosures from the State Defendants and, by extension, from the Department of Corrections or the State itself. The State Defendants finally made two separate document disclosures, pursuant to an amended pretrial scheduling order, while their motion to dismiss was pending. Both sets bear on Mullin's later attempt at amendment, although for very different reasons.

One set of disclosures, from July 2013 (the "July 2013 disclosures"), contained information on various prison policies regarding suicide watch, close custody, and screening procedures employed by the Assignment Facility. For instance, Mullin received a policy manual on "Special Needs Inmates," covering inmates who suffer from certain psychiatric disorders and are "unable to meet the functional requirements of incarceration without mental health treatment."[4] It appears that the July 2013 disclosures did not pertain to Robert individually or contain information relating to the night he died.

More important was a set of disclosures from April 2013 (the "April 2013 disclosures") that, by contrast, contained information directly relevant to Robert and his history in the prison system. Among the new revelations were statements from fellow inmates about a prison guard

---

[4] JA 1015.

7

who allegedly ignored Robert's requests for mental health services and, instead, told him to commit suicide.

These statements were contained in a February 2009 Department of Corrections Administrative Investigation Report ("the Report"). According to the Report, a previously unknown guard, Officer X,[5] interacted with Robert over his only evening at the facility, and may have been the last person (instead of Officer Dimler) to see Robert alive. The details of Officer X's interaction with Robert, as related in the Report, were very disturbing. Six inmates, who had been interviewed about Robert hours after his suicide—close in time to the incident, and potentially before having any opportunity to get their stories straight—volunteered that they had heard Robert ask Officer X to see "psych," and that Officer X had refused Robert's request and taken no action. Three of the inmates went further: Officer X not only refused assistance, but egged Robert on, telling him that he "might as well kill [him]self."[6] The Report therefore suggested Officer X's actual awareness of, and indifference to, Robert's condition. The Report elsewhere revealed that Robert was in fact classified as a "special needs" inmate requiring enhanced levels of care.[7] Thus, although Officer X, interviewed later, flatly denied both parts of this account, the Report had the potential to reframe and support Mullin's case.

---

[5] Because the guard is not currently a party and might not become one, his name is redacted in this opinion.
[6] JA 986.
[7] JA 989.

8

## E. Counsel's Error: The April 2013 Discovery is Misplaced

But this potential would go untapped—at least for the time being—because Mullin did not initially know that it had been received. The April 2013 material was subdivided and Bates stamped as "DOC MULLIN 0001–392" and "CONFIDENTIAL MULLIN 0001–305."[8] Due to a clerical error, Mullin's attorney failed to review the CONFIDENTIAL MULLIN material that contained the Report and other relevant documents. The disclosures had been provided by the State Defendants on two optical discs, one for the MULLIN material and the other for the CONFIDENTIAL MULLIN material. The attorney asked her staff to print out both discs for review, but one disc was printed twice and the other was misfiled in the folder of an unrelated matter. And because Mullin's attorney was not aware of the new material, she did not move to further amend her complaint, even though an earlier scheduling order had suggested that further amendment for truly "new" discoveries might be allowed.

## F. The District Court Dismisses the SAC

With Mullin unaware of the new discovery, the SAC—whose allegations were premised on the theory that the defendants should have known, based on Robert's answers to intake questions and his transfer/medical records, that he was particularly vulnerable to suicide—remained the operative complaint. Thus, unlike prior motions to dismiss, which had been interrupted by Mullin's requests to amend, these Rule 12

---

[8] JA 1098.

9

motions were resolved on the merits, with the District Judge directly addressing Mullin's claims for the first time. In a November 2013 decision, the District Court granted the State Defendants' motion to dismiss in its entirety, although the Court allowed Mullin's claims against the Assignment Facility intake nurse to proceed to summary judgment and, thus, the case remained ongoing.[9]

### G. Realizing the Mistake, Counsel Moves to Amend

Despite indications that something was missing, Mullin's attorney only realized her mistake in February 2014—ten months after the April 2013 disclosures, and three months after the District Court had dismissed the SAC in large part—during a conversation with attorneys for non-state defendants who were privy to the CONFIDENTIAL MULLIN material. In the flurry of activity that followed, Mullin's attorney advised the District Court of her mistake and, after being told by the court to delay formally moving to amend until a pending reconsideration motion was resolved. Mullin moved in August 2014 to amend her complaint to include information from the April and July 2013 disclosures. In addition to repleading claims against Dimler and other previously dismissed defendants, Mullin's proposed Third Amended Complaint ("TAC") incorporated the material from

---

[9] *See Mullin v. Balicki*, No. 11-247, 2013 WL 5935998, at *6 (D.N.J. Nov. 1, 2013). The halfway house itself, which had been named as a defendant but did not file a Rule 12 motion, also remained in the case through November 2015, when it entered into a stipulation of dismissal.

10

the April and July 2013 disclosures and added Officer X, a fellow guard, and four supervisors as defendants.

## H. Leave to Amend is Denied

The presiding Magistrate Judge denied leave to amend, finding that Mullin's delay was undue and that the defendants would suffer prejudice if amendment were allowed. The Judge also suggested in passing that claims against new parties would not "relate back" for limitations purposes under Rule 15(c). The Magistrate Judge did not directly address the futility of the proposed amendment, which had not been raised by the State Defendants. After Mullin objected to the Magistrate Judge's order, the District Court affirmed it in a short decision.[10]  Mullin timely appealed.

---

[10] *See* JA 80–85, 2015 U.S. Dist. LEXIS 90384.

11

## II.    DISCUSSION[11]

---

[11] We have jurisdiction under 28 U.S.C. § 1291. Mullin's appeal challenges the dismissal of the SAC (per Officer Dimler only) and the subsequent denial of reconsideration, in addition to the order denying further leave to amend. The last of these, which was the only topic addressed at oral argument, is discussed at length above the margin; the first two are summarily resolved in this note.

With regard to the order dismissing the SAC, we have reviewed the District Court's dismissal decision against the backdrop of *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), which clarified our vulnerability-to-suicide precedent but was decided after the District Court issued its opinion in this case. Having the benefit of the parties' supplemental briefing, we are satisfied that the District Court correctly dismissed the constitutional and state-tort claims against Officer Dimler for substantially the reasons set forth in that Court's opinion. We particularly agree that, when pleading a vulnerability-to-suicide claim, an allegation that a defendant "knew or should have known" of a prisoner's vulnerability is a conclusory recitation of the knowledge element of the underlying cause of action, and cannot meet the plaintiff's pleading burden without additional facts showing (or allowing the reasonable inference of) knowledge or the responsibility to know. *See Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (per curiam).

In light of our leave-to-amend disposition, we need not reach the order denying reconsideration, which was premised largely on the new discovery evidence probative of the

12

## A. Rule 15 and Standard of Review

Leave to amend is governed by Rule 15, "Amended and Supplemental Pleadings," which generally conditions amendment on the court's leave or the opposing party's written consent.[12] Lacking a time limit or an outer bound on when amendment is permissible, the Rule instructs courts to "freely give leave [to amend] when justice so requires."[13] This liberal amendment regime helps effectuate the "general policy embodied in the Federal Rules favoring resolution of cases on their merits."[14]

In determining whether leave to amend might reasonably be denied, courts are guided by the *Foman* factors, named for the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178 (1962). Denial of leave to amend can be based on undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility.[15] The *Foman* factors are not exhaustive, allowing a court to ground its decision, within reason, on consideration

---

request for amendment. Accordingly, both the order dismissing the SAC and the order denying reconsideration will be affirmed.

[12] *See* Fed. R. Civ. P. 15(a)(2).

[13] *Id.*

[14] *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4th Cir. 1987) (internal quotation marks and citation omitted).

[15] *Foman*, 371 U.S at 182; *see also United States ex rel. Schumann v. AstraZeneca Pharm. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014).

of additional equities, such as judicial economy/burden on the court[16] and the prejudice denying leave to amend would cause to the plaintiff.[17] All factors are not created equal, however,

---

[16] *See USX Corp. v. Barnhart*, 395 F.3d 161, 167–68 (3d Cir. 2004).
[17] *See Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998).
As they did before the District Court, the State Defendants suggest that the liberal amendment standard should not apply with its ordinary force because Mullin did not seek leave until after "judgment" had been entered—meaning, in this case, the order granting the pending motions to dismiss in large part. State Defs. Br. 26. They refer to a line of cases in which we explained that "[w]hen a party seeks leave to amend a complaint after judgment has been entered, it must also move to set aside the judgment pursuant to Federal Rule of Civil Procedure 59(e) or 60(b), because the complaint cannot be amended while the judgment stands." *Jang v. Boston Sci. Scimed, Inc.*, 729 F.3d 357, 367–68 (3d Cir. 2013); *see also Ahmed v. Dragovich*, 297 F.3d 201, 207–08 (3d Cir. 2002). The "judgment" in that line of cases, however, meant a final or appealable order. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272–73 (3d Cir. 2001). But here, judgment had not been entered at the time Mullin moved to amend, as the case was still ongoing against the intake nurse and the District Court had not otherwise solemnized its Rule 12 decision into a judgment by using Rule 54(b). *Jang*, *Cureton*, *Ahmed*, and other decisions in this line are thus distinguishable from this case, and no formal post-judgment standard applies (although these concerns can of course still be considered).

as "prejudice to the non-moving party is the touchstone for the denial of an amendment."[18]

A decision on whether to permit amendment of the pleadings generally falls within the District Court's discretion. It follows that we review for abuse of that discretion, except where amendment is denied for legal reasons drawing *de novo* review (such as when the proposed amendment would fail to state a claim).[19] If we find an error in the District Court's reasoning, we exercise our own discretion in determining whether we will nevertheless affirm "if . . . the District Court's [remaining] findings would support denial of leave to amend."[20]

While abuse of discretion is ordinarily a deferential standard of review, it has bite in this context; the District Court's discretion, circumscribed by the Rule 15's directive in favor of amendment, must be "exercised within the context of liberal pleading rules."[21] Moreover, leave to amend is not an all-or-nothing proposition. Relying on the *Foman* factors, courts can choose instead to impose reasonable conditions on the right to amend in lieu of a pure grant or denial.

---

[18] *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (internal quotation marks and citation omitted).

[19] *See Schumann*, 769 F.3d at 849.

[20] *Maersk*, 434 F.3d at 204.

[21] *Berkshire Fashions, Inc. v. The M.V. Hakusan II*, 954 F.2d 874, 886 (3d Cir. 1992); *see also Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 770 (5th Cir. 1999) (explaining that "discretion" is misleading because of the "bias in favor of granting leave to amend" (internal quotation marks and citation omitted)).

Specifically, a court "may use its discretion to impose conditions on the allowance of a proposed amendment as an appropriate means of balancing the interests of the party seeking the amendment and those of the party objecting to it," such as by "narrow[ing] the scope of the amendment if it considers the request too broad."[22]

One additional background consideration applies in civil rights cases like this one. In our Circuit, "district courts must offer amendment [in civil rights cases]—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."[23] By contrast, plaintiffs in "ordinary" civil litigation—commercial disputes, for instance—must take affirmative steps to obtain amendment in the face of dismissal.[24]

### B. Analysis

Although the District Court gave reasons of its own when declining to set aside the Magistrate Judge's order, we are really reviewing the Magistrate Judge's exercise of discretion in entering the order, and not the District Court's deferential review of the same. Accordingly, we will focus

---

[22] Wright & Miller § 1486; *see also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1271 (11th Cir. 2006) ("[T]he granting of leave to amend can be conditioned in order to avoid prejudice to the opposing party." (internal quotation marks and citation omitted)).

[23] *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007); *see also Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 861 (3d Cir. 2014).

[24] *See Fletcher-Harlee*, 482 F.3d at 252–53.

16

our review on the Magistrate Judge's analysis of the *Foman* factors.

### 1. Undue Delay

The "undue delay" factor recognizes that a gap between when amendment becomes possible and when it is actually sought can, in certain circumstances, be grounds to deny leave to amend. While simple delay cannot justify denying leave to amend by itself, delay that is "undue"—a delay that is protracted and unjustified—can place a burden on the court or counterparty, or can indicate a lack of diligence sufficient to justify a discretionary denial of leave.[25] As there is "no presumptive period in which . . . delay becomes 'undue,'"[26] the "question of undue delay requires that we focus on the movant's reasons for not amending sooner" while "bearing in mind the liberal pleading philosophy of the federal rules."[27] "Following this principle, we have refused to overturn denials of motions for leave to

---

[25] *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008); *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

[26] *Maersk*, 434 F.3d at 205. In *Maersk*, we suggested that an eleven-month delay, as measured from "commencement of an action," would not generally be "undue" by itself. *See Maersk*, 434 F.3d at 205. As discussed more fully below, there are two periods of delay here, the longer of which can be measured to run ten months. Although neither period of delay would be presumptively undue if measured from the beginning of a lawsuit, the reasoning of *Maersk* may not apply with equal force to delays measured from a different point in an already long-running lawsuit.

[27] *Cureton*, 252 F.3d at 273.

17

amend where the moving party offered no cogent reason for the delay in seeking the amendment."[28]

The Magistrate Judge broke down the delay in this case into two discrete periods. First, the Judge assessed the delay arising from the July 2013 "policy" discovery, which Mullin's counsel consciously chose not to use in an earlier amendment. Second, the Judge assessed the more-significant delay arising from the misplaced April 2013 discovery, which counsel was not aware of until February 2014.

### i) July 2013 Discovery

Mullin's attorney argued that her reasons for declining to amend immediately upon receiving the July 2013 discovery were reasonable, and that the delay before she first brought the material to the Court's attention was thus not undue.[29] She explained that she received the discovery after the return date for the motions to dismiss, assumed the period for requesting amendment was closed, and further assumed that the Court would not reopen the record. Counsel also argued that amending was unnecessary. She believed that the SAC's description of various policies and procedures was enough to survive the motions to dismiss, and that the meaning of the various policies of procedures would become clearer after she had received additional discovery.

---

[28] *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 629 (3d Cir. 2013).

[29] We assume, as the Magistrate Judge appears to have decided, that the relevant delay is from July to November, which is when Mullin brought the July 2013 discovery to the Court's attention via her motion for reconsideration

18

The Magistrate Judge found these reasons to be unconvincing, explaining that the closing-of-the-record point was "difficult to understand," as "[Mullin] has not refrained from seeking leave from the Court for various reasons."[30] The Magistrate Judge also thought that counsel's delay was impermissibly "tactical," resulting in "waiting until the Motions to Dismiss were largely granted, and then asking for a 'do-over.'"[31] Deciding that this delay was not supported by a cogent reason, the Magistrate Judge deemed it "clearly undue."[32]

We disagree in part with the Magistrate Judge's reasoning, and in particular with suggestion that counsel's "tactical" decision transformed the delay into one that was undue. While we have disdained a wait-and-see approach to amendment, our major cases doing so fall in the post-judgment posture discussed above.[33] More recently, we have cautioned against overreading the scope of some of those earlier cases.[34] Further, the decisions spurning a wait-and-see approach are "standard" civil disputes.[35] This, by contrast, is

---

[30] JA 73.

[31] JA 74.

[32] JA 74.

[33] *See supra* note 17; *see, e.g.*, *Jang*, 729 F.3d at 368; *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004) (addressing unjustified two-and-a-half-year delay).

[34] *See United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 252 (3d Cir. 2016) (distinguishing, among other things, *Jang* and *Adams*).

[35] *Jang* is a contract case, *see* 729 F.3d at 359; *Adams* is a securities case, *see* 381 F.3d at 270; and *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126

a civil rights case, with the attendant requirement in our case law that an opportunity to amend be presumed. In the ordinary course, a civil rights plaintiff would not expect a modest wait-and-see approach to constitute undue delay by itself—unless egregious or excessive, or if some other factor rendered the delay undue.

Our normal civil rights rule is put to the test in this matter, however, given the sheer complexity of the proceedings, as well as the fact that Mullin was previously granted leave to amend.[36] It is certainly reasonable to think that there may be some situations where a civil rights plaintiff's pre-dismissal actions, or a court's informal testing of the merits of the pleading, might count against granting amendment. But this case does not present such a situation. For one, although Mullin amended twice before, the second amendment (leading to the SAC) can be viewed as a perfection of the first, partially unsuccessful amendment.[37] For another, her pleadings had never actually been formally evaluated by the District Court, and "the mere fact that a defendant files a motion to dismiss is not necessarily

_____

(3d Cir. 2004), is a "securities class action lawsuit," *id.* at 134.

[36] *See Customs Fraud*, 839 F.3d at 252 ("In none of the cases the District Court relied upon did we uphold a dismissal with prejudice where the plaintiff *had been given no opportunity to amend its complaint* and would not be given an opportunity to amend in the future." (emphasis added)).

[37] *Cf. Bower v. Jones*, 978 F.2d 1004, 1010 (7th Cir. 1992) (favoring amendment despite prior amendments when party acquired newly discovered documents and did not delay in seeking amendment).

sufficient to put a plaintiff on notice that the court will find his complaint to be deficient."[38]

Perhaps most important is that the SAC was *informally* tested on the merits before the motion to dismiss was resolved—and received a clean bill of health from the same Magistrate Judge, who opined that it passed muster under *Twombly/Iqbal*.[39] The Magistrate Judge's decision was, of course, not binding on the District Court, let alone on us. But it does suggest that Mullin's "tactical" approach to the dismissal cannot be fairly called dilatory or contumacious, in light of the solicitude given in civil rights cases and the prior suggestion from the Magistrate Judge that the motion to dismiss would fail.

### ii) April 2013 Discovery

The April 2013 discovery—the disclosures containing the Report—presents a thornier problem. About ten months passed between the time the State Defendants sent Mullin's attorney the April 2013 disclosures and the time the attorney realized that she had misplaced and failed to review them. Certainly, Mullin had a "reason" for not amending sooner: she was unaware of the evidence that she had been provided.[40] The issue is whether this can suffice as a reason at all. We will, for the moment, disregard the issue of prejudice and instead look to whether, prejudice notwithstanding, the delay was "undue."

---

[38] *Customs Fraud*, 839 F.3d at 249.

[39] Order at 7, ECF No. 101.

[40] *See Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 188 (3d Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 1578 (2017).

In addressing counsel's error, the Magistrate Judge focused on the "many opportunities plaintiff had to realize that the disc was missing and to follow up or at least make inquiry," stating further that "no inquiry was made until counsel for defendants made Plaintiff's counsel aware of the oversight during a conversation in February 2014."[41] Several "clues" should have alerted counsel to the missing discovery: (1) the initial April 2013 cover letter, which referred to the production of confidential materials; (2) the subsequent production in July 2013 of additional CONFIDENTIAL documents with bates numbers following the "missing" range, which should have indicated that the "missing" range had already been provided[42]; and (3) an October 2013 interrogatory response that pointed to the Report but did not separately provide it. The Magistrate Judge concluded that counsel's "lack of diligence" was to blame, given the "repeated opportunities and repeated clues" that "should have made a diligent attorney aware that something was missing"; that there was "no inquiry made . . . leads to the inescapable conclusion that the [April 2013 discovery] delay was in fact undue."[43]

Beginning with this last point, the record does not entirely support the Judge's conclusion that Mullin's attorney failed to make "inquiries." To the contrary, she continued to ask the Attorney General's office for relevant discovery; the

---

[41] JA 75.

[42] The April 2013 production of confidential materials had a Bates stamp range of 0001-0305, and the July 2013 production of confidential material had a bates stamp range of 0306-0918. JA 887, 889

[43] JA 76.

22

record contains, for instance, a June 2013 email to the Attorney General where counsel complains that nothing relevant to her constitutional claims has been obtained from the State Defendants.[44]

However, the central question is whether this is the sort of error by an attorney that can be excused. The Magistrate Judge indicated only that the error "should not be excused,"[45] but, as explained below, something more is required.

It is well established that "clients must be held accountable for the acts and omissions of their attorneys."[46] In some circumstances, the Federal Rules allow for a court to relieve a party from adverse consequences arising out of "mistakes" or "excusable neglect," which are often not the party's but the attorney's.[47] In that context, we have conducted an "equitable" inquiry into the circumstances

---

[44] *See* JA 689. We note that, if the October 2013 interrogatory response referring to the Report is the point where a reasonable attorney should have been alerted to the missing discovery, it may have been appropriate to measure the delay from the time of reasonable discovery as opposed to the moment when the initial error occurred, depending on whether the error was in fact excusable.

[45] JA 76.

[46] *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993).

[47] *See, e.g.*, Fed. R. Civ. P. 60(b)(1) (allowing for relief from a final judgment on the basis of "mistake, inadvertence, surprise, or excusable neglect"); Fed. R. App. P. 4(a)(5) (allowing for extension of time to appeal a notice of appeal when a party shows "excusable neglect or good cause").

surrounding a party's failure, balancing the factors of prejudice to the non-movant, the length of the delay, the reason for the delay, and the movant's good faith.[48]

While misunderstandings based on law or procedure rarely constitute excusable neglect, clerical errors have been found to do so, taking "into account whether the mistake was a single unintentional incident (as opposed to a pattern of deliberate dilatoriness and delay), and whether the attorney attempted to correct his action promptly after discovering the mistake," as a "mistake could occur in any attorney's office, no matter how well run."[49] An omission caused by carelessness, even if within counsel's control, may therefore be excusable.[50]

Rule 15, which governs amendment, does not mention excusable neglect or mistake, but this is in line with Rule 15's general omission of any enumerated substantive or procedural limitation on amendment. And based on the similarities between the Rule 15 test and the excusable neglect analysis, mistakes, omissions, or neglect, should be evaluated with

---

[48] *Ragguette v. Premier Wines & Spirits*, 691 F.3d 315, 319, 325 (3d Cir. 2012); *see also Jennings v. Rivers*, 394 F.3d 850, 857 (10th Cir. 2005) ("An additional consideration is whether the . . . underlying claim is meritorious."). This equitable test is not at all dissimilar from the Rule 15 amendment inquiry. As a result, some courts use the same analysis in determining whether a Rule 15 delay is undue. *See, e.g.*, *Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981).

[49] *Jennings*, 394 F.3d at 857 (internal quotation marks, alterations, and citations omitted).

[50] *See Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 849–50 (11th Cir. 1996).

similar solicitude under Rule 15 as they would be under a Rule with an explicit "excusable neglect" condition.

Here, even assuming the worst—that the delay ran at least ten months, and that Mullin's attorney failed to realize the error despite clues to the contrary—we cannot say that the mistake here was *per se* inexcusable, rendering the delay "undue." It was apparently the result of a single core error, the kind that could affect any law firm no matter how well run; there is no indication of any similar error elsewhere in the litigation; and the defense has not shown a pattern of similar faults or omissions.

Neither the State Defendants nor the District Court questioned the attorney's story that a clerical error led to the CONFIDENTIAL MULLIN materials being misplaced and misfiled. The record prior to March 2014 betrays no indication that Mullin or her attorney was aware of the Report or the related materials; as late as November 2013, Mullin's attorney referred to the April 2013 disclosure as having produced nothing new or revelatory.[51] Nor is there indication that Mullin could have obtained the CONFIDENTIAL MULLIN documents before she did. And when the mistake *was* discovered, counsel moved swiftly to bring it to the Court's attention; the delay prior to the filing of the formal motion to amend was due to a scheduling order delaying

---

[51] *See, e.g.,* Brief in Support of Motion for Reconsideration 3 ("In April 2013 plaintiff received initial discovery from the State Defendants which was limited to the records already in plaintiff's possession."), ECF No. 155-2.

consideration of amendment until reconsideration had been granted or denied.[52]

For the above reasons, we disagree with the Magistrate Judge that the delay attributable to the April 2013 discovery was "inescapabl[y]" undue.[53] The record indicates that counsel followed up on documents that appeared to be missing; while counsel undoubtedly erred, with disastrous consequences for her client, the Magistrate Judge did not properly inquire as to whether the mistake was excusable in context, or from when the delay should have been measured. These considerations should be addressed on remand.

## 2. Prejudice

As set forth above, prejudice to the non-moving party has long been the "touchstone" for the denial of leave to amend.[54] Here, the State Defendants had argued that the

---

[52] On the other hand, Mullin's attorney does not help her cause by arguing on appeal, as she did before, that the Attorney General should have simply told her that she was missing something. The Attorney General does not appear, as an ethical matter, to owe that enhanced degree of fairness to opposing counsel, so long as it does not undermine the candor required towards the tribunal. *See* N.J. R.P.C. 3.4; *cf. also In re Jemsek Clinic, P.A.*, 850 F.3d 150, 159 (4th Cir. 2017) ("Under our adversarial system, litigants are not their opponents' keepers. They have no duty to help their opponents maximize their recovery or prevent them from losing their claims.").

[53] JA 76.

[54] *See Heyl & Patterson Int'l, Inc. v. F. D. Rich Hous. of V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981); *United States v. 47*

26

"numerous motions to amend" and other briefings had led them to expend significant resources on the litigation, and they further objected to Mullin's "adding completely new defendants at this late stage of the litigation."[55] They asked the Magistrate Judge to "intercede by denying [amendment] and putting a stop to what seems like an endless cycle."[56]

The Magistrate Judge largely agreed with this line of argument. In a short discussion on prejudice, the Judge found that "[t]he current defendants, as well as those who have already been dismissed, have spent significant resources on this litigation, and they would essentially be forced back to square one." With regard to the *proposed* defendants, there was "nothing beyond speculation to support the notion that . . . there would not be prejudice to them in defending on the merits."[57] In the summary section, the Judge wrote that "allowing the amendment at this point of the litigation, after so much motion practice, would only cause further delay, to the prejudice of the parties."[58]

At the outset, the arguments against amendment advanced here and by the State Defendants on appeal do not connect prejudice to the additional delay caused by the mistake of Mullin's attorney. Rather, these claims of prejudice would have applied with near-equal force had Mullin timely moved to amend immediately upon obtaining the April 2013 disclosures. Accordingly, we view the "delay"

---

*Bottles, More or Less, Jenasol RJ Formula "60"*, 320 F.2d 564, 573 (3d Cir. 1963).

[55] JA 76.

[56] JA 20.

[57] JA 77.

[58] JA 78.

complained of here as referring to the pendency of the litigation as a whole and not to the delay in seeking to amend once the CONFIDENTIAL MULLIN documents were disclosed.

Thus framed, we again disagree with the Magistrate Judge's analysis. Mullin appears to be largely without fault for the years that passed before she obtained the CONFIDENTIAL MULLIN documents which radically altered her understanding of the night Robert took his own life. The State Defendants have not argued that she could have obtained the Report earlier, or that there was a hint of the proposed new defendants—and especially Officer X—in any of the discovery documents prior. While the State Defendants are within their rights to comply only with those discovery obligations actually due under law, they cannot persuasively rely on resulting delay as a source of prejudice.[59]

It was also not improper for Mullin to replead dismissed defendants and claims in her proposed amended complaint. At the time she filed her proposed TAC, Mullin may not have decided whether she intended to pursue the already dismissed claims and parties on appeal, and including them in the proposed TAC preserved that right. Because an amended complaint supersedes the original, "parties

---

[59] *Cf. Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 560 (7th Cir. 2011) ("Prejudice manufactured by a defendant is not a ground for refusing relation back."). The multiple rounds of motions practice are also of uncertain relevance to prejudice. Had Mullin sought leave to amend at the moment when she obtained the April 2013 disclosures, she would have interrupted pending Rule 12 motions then, too.

voluntarily dropped from an amended complaint do not remain in the case."[60] Claims omitted from an amended complaint remain in the case only if previously dismissed on "legal grounds, rather than due to a lack of factual specificity."[61] Dropping parties and dropping claims can therefore lead to abandonment later in the case and on appeal. Thus, to the extent that the Magistrate Judge counted this against Mullin with regard to prejudice or judicial economy, it was error to do so; since the abandonment rule applies only to claims or parties "voluntarily" dropped, allowing amendment but conditioning it on omission of previously dismissed claims or parties does not trigger the rule, and is the preferred way to resolve the problem.

It is thus not correct to say that granting leave to amend would put the defendants back at square one or perpetuate an infinite cycle. The Magistrate Judge would have been entitled to rely on the District Court's earlier dismissal opinion in determining whether previously dismissed defendants should remain in the case, and could have set further conditions on amendment, discovery, and so on. The "cycle" of motions practice interrupted by amendment requests based on new evidence remains a risk only for as long as discovery remains open.[62] And because Mullin did not appeal the dismissal of any defendants other than Dimler, or the subsequent grant of summary judgment for the intake

---

[60] *Palakovic*, 854 F.3d at 221 n.13.

[61] *Id.* at 221.

[62] *See Miller v. Admin. Office of the Courts*, 448 F.3d 887, 898–99 (6th Cir. 2006) (explaining that the close of discovery indicates prejudice).

nurse, any challenges relating to those decisions have now been abandoned.[63]

In sum, while the defendants have undoubtedly expended resources over the course of the litigation, and would have to expend additional effort were amendment allowed, their case for prejudice is thin. A defendant that possesses an explosive document unknown to the plaintiff may use the legitimate litigation strategies at hand to delay disclosure of that document until absolutely necessary, but that delay cannot thereafter form that defendant's argument for prejudice if it leads to a belated request to amend. Because the State Defendants did not persuasively articulate a theory of prejudice, and because the Magistrate Judge's discussion relied on factors that appear to have been allowable litigation choices on Mullin's behalf, we will vacate for reconsideration of this factor.

### 3. Judicial Economy

Judicial economy is an equitable consideration that can be considered in deciding whether amendment should be allowed. It is uncommonly a factor that stands entirely alone, separate and apart from prejudice and factors relevant to

---

[63] *See Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 263 (3d Cir. 2008) (collecting cases); *Cty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) (when "a decision made at a previous stage of litigation" was not "challenged in the ensuing appeal . . . [,] the parties are deemed to have waived the right to challenge that decision").

whether a delay was "undue."[64] Considerations include judicial efficiency and effective case management.[65]

The Magistrate Judge appeared to consider judicial economy by discussing the work already done by the Court: the "almost four years" that had passed since its filing, at least "eight conferences" that had been held with the parties, and the extensive motions practice that included "at least four motions to dismiss."[66] The Magistrate Judge also referred to the District Court's work "in preparing a 40-page opinion, which would be rendered moot if the amendment were allowed to proceed."[67]

While the litigation had doubtlessly been frustrating, and Mullin's apparent minimization of the many stumbles throughout is discouraging, the Magistrate Judge's focus on the past inappropriately constrains the scope of the judicial economy inquiry. The difficulty in managing the litigation thus far is certainly salient, but simply tallying up the number of motions, conferences (of any type), and opinions sheds little light on whether future management of the case would encounter similar difficulties. The length of the District Court's opinion on dismissal, and the effort behind it, are also of uncertain weight, especially in light of this Circuit's

---

[64] *See, e.g.*, *Little v. Liquid Air Corp.*, 952 F.2d 841, 846–47 (5th Cir. 1992) (affirming denial of leave to amend because party's delay imposed burdens both on the defendants and on the court).

[65] *See Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 322 (5th Cir. 2009).

[66] JA 77.

[67] JA 77.

31

default presumption in favor of amendment in civil rights cases.

As cast in this case, "judicial economy" sounds almost like a sanction for prior perceived errors. As presented, it does not currently support the Magistrate Judge's decision to deny leave to amend.

### 4. Relation Back and Timeliness

The Magistrate Judge summarily addressed, and the parties have briefed before us, the doctrine of "Relation Back." This refers to the operation of Rule 15(c), which allows certain new claims and new parties added in an amended complaint to "relate back" to the date of filing of the original complaint for statute of limitations purposes if certain conditions are met.[68] While courts are permitted to combine the question of whether amendment should be granted with the issue of whether the proposed amendment relates back,[69] the two inquiries are analytically distinct; relation back is a test of the legal viability of the proposed amendment, and not a discretionary factor weighing in favor of or against amendment.[70] Thus, in certain cases, the "better approach" is to treat leave to amend and relation back/timeliness separately, determining first whether amendment should be allowed under the discretionary factors, and only then passing

---

[68] *See Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001).

[69] *See, e.g.*, *Maersk*, 434 F.3d at 204.

[70] *See Garvin v. City of Phila.*, 354 F.3d 215, 222 (3d Cir. 2003).

on whether the complaint relates back or is otherwise timely.[71]

On this record, we conclude that determining whether the complaint "relates back" is unnecessary, at least with regard to Mullin's 42 U.S.C. § 1983 vulnerability-to-suicide constitutional claims brought against Officer X. The allegations against Officer X would be timely on their face.

The accrual date of a § 1983 claim is determined under federal law.[72] Generally, a constitutional claim under § 1983 accrues when the plaintiff knew or should have known of the injury upon which the action is based.[73] A vulnerability-to-suicide claim, which is simply a more specific articulation of the Eighth Amendment rule that prison officials must not be deliberately indifferent to a prisoner's serious medical needs, requires showing (1) the existence of a particular vulnerability to suicide, (2) that a prison official knew or should have known of the individual's particularly vulnerability, and (3) that the official acted with reckless or deliberate indifference to the particular vulnerability.[74] The accrual of the claim is not tied solely to the prisoner's suicide

---

[71] *Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 558–59 (7th Cir. 2011); *see also Glover v. FDIC*, 698 F.3d 139, 144–48 (3d Cir. 2012) (on dismissal posture, addressing relation back and timeliness separately).

[72] *Montanez v. Sec'y Pa. Dep't of Corr.*, 773 F.3d 472, 480 (3d Cir. 2014).

[73] *Id.*

[74] *Palakovic v. Wetzel*, 854 F.3d 209, 222, 223–24 (3d Cir. 2017).

itself, but also to the unconstitutional act by the prison official that gives rise to the claim.[75]

Here, the actual nature of the claim against Officer X was unknown to Mullin until the receipt, by counsel, of the April 2013 disclosures. Mullin's claim against the prior State Defendants, premised on their alleged failure to be put on notice of Robert's intake answers and transfer materials, stemmed from a different asserted injury. Officer X, by contrast, is alleged to have *specifically* known of Robert's need for mental-health intervention and to have disregarded it. Mullin would not have been put on notice of the elements comprising this separate injury by the pre-April 2013 disclosures, and the fact of Robert's death itself did not otherwise cause the limitations period to start running. As discussed above, Mullin's investigative diligence has not been called into question. Thus, either innately or through the application of the discovery rule,[76] the facts of this case show

---

[75] *Cf. Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (per curiam) (explaining that the date of the act, not the date of consequences, controls); *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) (Posner, J.).

[76] *See United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010) ("The discovery rule starts the statute of limitations running only when the plaintiff learns that he's been injured, and by whom."). We need not definitively determine whether the timeliness of Mullin's proposed amended complaint is due to deferred accrual, deferred commencement of the limitations period, or tolling. *See William A. Graham Co. v. Haughey*, 646 F.3d 138, 147–50 (3d Cir. 2011) (discussing imprecision between accrual and the running of the

that Mullin could not have learned of the particular nature of *this* serious disregard of Robert's mental state—or who was at fault—until she had obtained the Report or its equivalent. Mullin's attempt to amend therefore fell well within the applicable two-year limitations period if measured from the April 2013 disclosure date.[77]

### C. Summary

For the above reasons, we conclude that the Magistrate Judge's exercise of discretion was not within the boundaries contemplated by Rule 15 or the *Foman* factors, in light of the liberal pleading regime established by the Federal Rules. We remand for the Magistrate Judge or District Court to reassess the propriety of amendment under the proper framework. The Court may also wish to weigh whether the claims advanced by Mullin on the basis of the new discovery are meritorious in deciding whether amendment is warranted.[78] If the Court nonetheless decides that the delay was undue or that the defendants have articulated past or potential future prejudice, the Court may wish to consider whether attaching conditions to amendment, or limiting amendment to certain claims and parties, suffices to mitigate those concerns. Finally, while we have determined that the § 1983 claims against Officer X would be timely if allowed to proceed, the District Court may consider whether Rule 15 relation back—including the

---

limitations period, especially with regard to the discovery rule).

[77] *Dique*, 603 F.3d at 185.

[78] *See Jennings*, 394 F.3d at 857.

application of the New Jersey fictitious party rule[79]—or other limitations doctrines suffice to render timely other claims against other proposed parties.

**III.     CONCLUSION**

For the foregoing reasons, we will affirm in part, vacate in part, and remand.

---

[79] *See DeRienzo v. Harvard Indus.*, 357 F.3d 348, 353–54 (3d Cir. 2004) (addressing N.J. Ct. R. 4:25-4).