**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-1801
_____

DEBRA L. ALEXANDER, adoptive parent and Administratrix of
the Estate of Scott Alonzo Alexander,

Appellant

v.

MONROE COUNTY; DONNA ASURE, individually and officially as Warden of
Monroe County Correctional Facility; JAMES LANDON; PRIMECARE
MEDICAL INC; DR. ALEX T. THOMAS; DR. DEBRA WILSON;
LPN WENDY JOHNSON; DR. FNU DEDANIA

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-13-cv-1758)
District Judge:  Honorable Malachy E. Mannion
_____

Submitted under Third Circuit L.A.R. 34.1(a)
December 14, 2017

Before:  CHAGARES, RESTREPO, and FISHER, *Circuit Judges*

(Filed: May 22, 2018)

_____

OPINION*
_____

RESTREPO, *Circuit Judge*

This civil rights action, brought under 42 U.S.C. § 1983, arises from the suicide of Scott Alonzo Alexander ("Alexander") during his incarceration at the Monroe County Correctional Facility in Pennsylvania ("MCCF"). Appellant, Debra L. Alexander, the decedent's adoptive parent and administratrix of his estate, appeals the District Court's grant of summary judgment in favor of appellees, Dr. Alex T. Thomas, Dr. Kishorkumar G. Dedania, and PrimeCare Medical, Inc. ("PrimeCare"),[1] on appellant's claims that appellees violated Alexander's constitutional right by being deliberately indifferent to Alexander's particular vulnerability to suicide. Because we agree with the District Court that appellant was unable to make such a showing, we affirm.

**I.**

On April 24, 2011, Alexander was arrested on charges of theft by unlawful taking, receiving stolen property, and recklessly endangering another person. At the time of arrest, he was on parole from previous charges.

---

* This disposition is not an Opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] During the relevant time period, Drs. Thomas and Dedania, both psychiatrists, had contracted with PrimeCare to provide psychiatric services to inmates incarcerated at MCCF.

As a result, Alexander was incarcerated at MCCF, and upon intake he underwent an initial screening for suicide risk and was thereafter placed on a Level I suicide watch. Under Level I, documented checks occur every 15 minutes, inmates are stripped of all clothing, no bedding is permitted other than a mattress, inmates are provided a suicide smock, inmates are not permitted commissary privileges, and they may be served only finger foods so that no utensils are used. Inmates can only be removed from Level I or Level II suicide watch by a psychiatrist.

While incarcerated, Alexander was seen on April 26th, 27th, and 28th in 2011 by Jennifer Pitoniak, a licensed social worker employed with PrimeCare as a mental health clinician. Ms. Pitoniak indicated that during all three occasions, Alexander had no suicidal or homicidal thoughts, plan, or intent. Alexander also expressed that he wanted his clothes back.

Dr. Thomas evaluated Alexander on April 30, 2011, at which time Alexander had no suicidal ideation, was "friendly and cooperative, [and] want[ed] to live for his family." Dr. Thomas adjusted the suicide watch from Level I to Level II. Under Level II suicide watch, an inmate continues to be observed every 15 minutes but has access to clothing, toiletries, and a blanket. Dr. Thomas had no further personal contact with Alexander.

Ms. Pitoniak saw Alexander again on May 2nd, 3rd, and 5th. She reported that Alexander was feeling much better, with no suicidal or homicidal ideation.

On May 7, 2011, Dr. Dedania evaluated Alexander and reported that Alexander was complaining of a lack of sleep and feeling anxious with paranoia. Based on his

3

examination, the doctor found Alexander had no suicidal or homicidal ideation and no psychosis. Dr. Dedania modified Alexander's medications, and downgraded him to Level III mental health watch.

Ms. Pitoniak saw Alexander on May 10th and noted his demeanor was calm, and he had no suicidal ideation. In fact, Alexander indicated he was feeling much better, and Ms. Pitoniak discontinued the Level III mental health watch.[2]

Dr. Dedania and Ms. Pitoniak continued to evaluate Alexander during the following two months on multiple occasions. While there were days during that period on which Alexander expressed feelings of anxiety or paranoia, for which the doctor prescribed or adjusted medication as appropriate, there were other days on which Alexander expressed that he was feeling better. During this period, the evaluations of Dr. Dedania and Ms. Pitoniak continued to find Alexander to have no suicidal or homicidal ideations.

On July 18, 2011, Alexander's parole was revoked, and he was remanded to the MCCF to serve the remainder of his sentence.[3] Later that same day, he expressed during

---

[2] Unlike Levels I and II, a mental health professional such as Ms. Pitoniak had the discretion to remove an inmate from a Level III mental health watch.

[3] Since Alexander's "maximum date" for release upon revocation of parole was Oct. 2, 2011, he had about 2 ½ months of his sentence remaining.

a personal telephone conversation an intention to kill himself.[4]  The next day, on July 19, 2011, Alexander tragically committed suicide in his cell.

## II.[5]

In *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), we confirmed that, when a plaintiff seeks to hold a prison official liable for failing to prevent an inmate's suicide,

> whether a pre-trial detainee or a convicted prisoner, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference,[6] meaning something beyond mere negligence, to the individual's particular vulnerability.

*Id.* at 223-24 (quotation marks omitted) (footnote added); *see Mullin v. Balicki*, 875 F.3d 140, 158-59 (3d Cir. 2017) (citing *Palakovic*, 854 F.3d at 222, 223-24).  A "strong

---

[4] Appellant does not argue on appeal that appellees were aware or should have been aware of this telephone conversation prior to Alexander's death by suicide.

[5] The District Court had subject matter jurisdiction over appellant's § 1983 claims pursuant to 28 U.S.C. § 1331.  We have appellate jurisdiction under 28 U.S.C § 1291.  When reviewing a District Court's Order granting a motion for summary judgment we exercise plenary review, applying the same standard utilized by the District Court to determine whether the moving party has demonstrated that there is no genuine issue of material fact.  *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1020 (3d Cir. 1991) *("Colburn II")*.

[6] In *Colburn II*, we found it unnecessary to "precisely define the terms 'deliberate indifference' or 'reckless indifference,' concluding that, whichever formulation is employed, it indicates a level of culpability beyond mere negligence." *Palakovic*, 854 F.3d at 224 n.15.  Similarly, here, it is unnecessary for us to "parse these phrases to determine whether there is some distinction between them." *Id.*

5

likelihood" of suicide "must be so obvious that a lay person would easily recognize the necessity for preventative action." *Palakovic*, 854 F.3d at 222 (quoting *Colburn II*, 946 F.2d at 1025) (citation and quotation marks omitted).

This Court has recognized that "it would be inappropriate to place custodial officials in a position in which they must guarantee that an inmate will not commit suicide." *Id*. (citing *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) ("*Colburn I*")). We have "required a relatively high level of culpability on the part of prison officials before holding them accountable, *i.e.*, reckless or deliberate indifference to that 'strong likelihood' of suicide." *Id*. "[L]iability may attach only where the officials' culpability is something beyond mere negligence." *Id*. (citing *Colburn II*, 946 F.2d at 1024-25). Indeed, "it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (citing *Brown*, 903 F.2d at 278).

In this case, even assuming appellant could demonstrate the first two prongs of the vulnerability to suicide framework, no reasonable juror could conclude that Drs. Thomas or Dedania acted with reckless or deliberate indifference to Alexander's alleged particular vulnerability to suicide.[7] After nearly a week of incarceration on Level I

---

[7] Thus, we need not address the first two prongs of the 3-pronged vulnerability to suicide framework.

suicide watch, during which time Alexander had no suicidal thoughts, plan, or intent, Dr. Thomas evaluated Alexander and kept him on suicide watch, but reduced it to Level II.

During the following week, Ms. Pitoniak's evaluations reflected that Alexander had shown signs of improvement and continued to have no suicidal ideation. Dr. Dedania thereafter evaluated Alexander and found that although Alexander had expressed feeling anxious and paranoid, there was no suicidal ideation and that reducing Alexander from Level II suicide watch to Level III health watch was appropriate. A few days later, Alexander showed improvement, and Ms. Pitoniak removed him from Level III.

Evaluations of Alexander for more than two months thereafter reflected there was no suicidal ideation, and during times when Alexander expressed anxiety or other symptoms, his medication was adjusted and monitored. While the reports of appellant's expert express a difference of opinion as to whether Alexander should have been removed from suicide watch during his incarceration, those reports do not reasonably support a finding that Drs. Thomas or Dedania were deliberately indifferent to Alexander's alleged particular vulnerability to suicide. Nor does the suggestion of appellant's expert that Alexander's suicide could have been prevented by leaving him on Level I suicide watch support a finding of reckless or deliberate indifference. Since, in viewing the evidence in the light most favorable to appellant, there is no genuine issue of material fact regarding the lack of reckless or deliberate indifference on the part of Drs. Thomas or Dedania, we affirm the District Court's granting of summary judgment in their favor.

7

Appellant also asserted a vulnerability to suicide claim against PrimeCare, the corporation providing medical services at MCCF. To support a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must be able to show "a policy or custom *that resulted in the* alleged constitutional violations." *Palakovic*, 854 F.3d at 232 (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003)) (emph. added). Thus, as appellant concedes,[8] appellant must establish an underlying constitutional violation to attribute liability to PrimeCare. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986); *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978); *Johnson v. City of Phila.*, 837 F.3d 343, 354 (3d Cir. 2016) (citing *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003)); *see also Natale*, 318 F.3d at 582-84 (acknowledging that § 1983 claim against Prison Health Services (PHS) for its policy or custom was only viable if, among other things, there was evidence that PHS employees were deliberately indifferent to the plaintiff's serious medical needs). Since appellant is unable to do so, summary judgment was properly granted in favor of PrimeCare.

The Judgment of the District Court is affirmed.

---

[8] *See* Appellant's Reply Br. 2 ("[Appellant] must show the existence of an official policy or custom which caused the underlying actors to be deliberately indifferent to [Alexander's] vulnerability to suicide.").

8